[No. 33754.    Department Two.    September 5, 1963.]

THE STATE OF WASHINGTON, *Respondent,* v. CLAUDE WILLIAM HARRIS, *Appellant.*\*

*Jack J. Lobdell* (of *Roderick, Lobdell, Makus & Coney*), for appellant.

*Charles O. Carroll* and *Victor V. Hoff,* for respondent.

DONWORTH, J.—This is an appeal from a judgment and sentence of life imprisonment entered upon a verdict of guilty of a charge of murder in the first degree. The jury did not inflict the death penalty.

\*Reported in 385 P. (2d) 18.

The state's evidence was entirely circumstantial, since no one witnessed the homicide which was very brutal and revolting. We shall not describe it in detail in this opinion except to the extent necessary to an understanding of appellant's 13 assignments of error.

Appellant did not take the stand, and his only evidence consisted of copies of two wills (which will be discussed later in this opinion). He was represented at the trial by counsel other than the attorney who is representing him on this appeal.

The information on which appellant was tried charged him with murder in the first degree, committed on or about July 28, 1955, by (1) striking, beating, wounding, choking, or strangling Belle May with a premeditated design to effect her death, from which wounds she then died, *or* (2) while engaged in the commission of, or attempt to commit, the crime of rape, he inflicted mortal wounds on Belle May, from which she then died.

The trial began on February 26, 1956, and ended March 5, 1956.[1] The verdict was returned the following day. The state produced 37 witnesses and a total of 72 exhibits were marked for identification (some of which were not admitted in evidence).

The state's evidence tended to show that Mrs. May was a widow 72 years of age, who lived in her home near Renton. July 28, 1955, one of her married daughters drove to her mother's house to take her out in the car. She arrived in front of the house about 12:45 p. m. and honked her horn. Receiving no response from her mother, she sent her 14-year-old son into the house. He went upstairs, saw part of her body, and ran back to the car. He told his mother that something terrible had happened to his grandmother. The daughter then rushed upstairs, saw her mother's body, and hurried home, where she called the police. She and her husband and her son returned to her mother's house

---

[1] The delay of 7 years between the end of the trial and the hearing in this court has been due to proceedings relative to appellant's right to proceed in forma pauperis on a record provided at public expense.

about 1:30 p.m., where they found at least eight law enforcement officers on the premises.

Mrs. May's body was not found in her own bedroom but in another bedroom used by her brother-in-law, Fred May. They had both lived in the house for many years. He was employed at the Pacific Car & Foundry Company plant near Renton, and had left home for work about 7:30 a.m. on the day of the homicide. Mrs. May's daughter telephoned him at the plant about 1:30 p.m. regarding the tragedy and met him at the house when he arrived there by taxicab.

Fred May was the sole beneficiary under Mrs. May's will, to the exclusion of her two daughters. He committed suicide about 10 days after her death, leaving a will in which he named as his sole legatee Mrs. May's daughter (who had telephoned him about the homicide). During the period between Mrs. May's death and his suicide, Fred May did not go to work regularly; he acted "awfully nervous," according to a coworker who had been a close friend of Fred May's for 5 years. After the homicide, Fred May worked for 2 days and then told this man that he was going to lay off work for a few days to attend to some personal business. These circumstances were argued to the jury by the defense counsel in an attempt to cast doubt upon the guilt of appellant. The verdict of the jury shows that they did not find the argument convincing in light of the other evidence presented by the state.

Dr. Wilson, who performed an autopsy on the body of Belle May, described the condition of her body in detail, using pictures admitted in evidence. A vacuum cleaner cord was around the victim's neck when he first saw the body in the morgue. Attached to the cord was the handle. The autopsy surgeon gave as his opinion that death occurred between 10 a.m. and noon on July 28, 1955. As to the cause of death, Dr. Wilson testified:

" . . . The cause of death was a compound fractured skull as a result of the fractures that you see here, and also it shows in [Exhibit] 38 a protruding tongue which showed that she was still alive at the time the vacuum

cleaner cord was drawn around her neck, and the immediate cause of death was strangulation. She probably would have died from the skull fracture very shortly, but she was still alive when the cord was looped about her neck."

Appellant was an electrician, who was employed to do certain electrical installation work at Mrs. May's home. He had worked there several days before her death. On the day of her death, his car was seen parked near her house at about 9 or 9:30 a.m., and again at 11:15 a.m.

The state's evidence further showed that appellant, on the day of the homicide, was wearing crepe-soled shoes, which made footprints with a distinctive pattern. Such footprints were found in the hall near the door to the bedroom on the second floor, where the body was discovered, and others were found going into Mrs. May's bedroom and on the stairs leading to the bedrooms. Such footprints were also found on the downstairs porch near the fuse box, in the hallways, and in the dust in the carport and garage. At the time of his arrest he had some recent scratches on his cheeks, one ear, and on his chest. He said that he had cut himself while shaving. A spot of human blood was found on one of his shoes.

Appellant, at the time of the homicide, was a divorced man, 53 years of age, who lived in Kent where he had an electrical repair shop. He was arrested about 6 p.m. on July 28, 1955, while driving his car on a street in Kent. That evening, he gave an oral statement to two detectives at the sheriff's office in Seattle in which he told of his movements during the 12-hour period prior to his arrest. Concerning his activities at the May home on the morning of July 28, appellant's statement (as written down by one of the detectives in his presence) contained the following:

"I drove directly to May's getting there about 9:00 a.m. May's is the house just this side of the Renton Auction Barn, Renton, Washington. When I got to Mays I waterproofed the flashing on the porch roof. The [*sic*] then filled out the white inspection card shown to me by the detectives. After I filled that out the inspector happened to come by and he had me change one of the wires to the

hot water tank. I changed it and then when I was through with it I checked the circuits and fuses again and everything seemed to be in working order. I left the door of the fuse-box open waiting for the inspector to come back for the final check—they always do that so far as I know. I then told Mrs. May that I was finished and that I was going. Mrs. May then told me to come in and have a glass of beer before I left. Mrs. May's opened a can of Schlitz for me and I poured it into a glass and drank it. This was near the table in the kitchen. At the same time I was drinking the beer she was sitting at the kitchen table drinking wine. She had a water glass about half full from what I know. While I was drinking the beer Mrs. Mays was worried about getting the stove in. I left after that probably about 10:00 or 10:30 and I went directly to the Renton power company and asked one of the girls there if they had the report for Mrs. May's thru wire service. The girl checked the file and she said that she already had it. . . ."

The state introduced other circumstantial evidence tending to connect appellant with the homicide. The total evidence, if believed by the jury, was sufficient to support the verdict.

We now consider appellant's assignments of error in the order in which they are stated in his brief.[2]

Assignment No. 1. It is claimed that the trial court erred in admitting, over objection, six specific items: a vacuum cleaner handle, a piece of the vacuum cleaner, pieces of a mirror, an apron (all found in the bedroom where the victim's body was discovered), and a brassiere taken from her body. These exhibits were mailed by the sheriff's office to the FBI in Washington, D. C. An FBI officer testified that he had examined these exhibits and subjected them to certain tests. Thereafter, they were returned to the sheriff's office in Seattle. Appellant contends that these exhibits were not shown to have been in the custody of law officers at all times before being admitted in evidence.

[2]Appellant, pro se, served on the prosecuting attorney and filed in this court a 49-page brief (written in longhand) entitled "Petition for a Motion of Appeal." This document has been considered in the preparation of this opinion.

Appellant, in support of this assignment, cites *State v. Williams*, 49 Wn. (2d) 354, 301 P. (2d) 769 (1956), in which the court was concerned with the question of the genuineness of a tape-recorded confession. That case is not in point here for reasons that are clear from a reading of the opinion.

We have examined the testimony relating to these six exhibits and are of the opinion that the trial court did not abuse its discretion in admitting them in evidence. The weight to be given these items as bearing on the issue of appellant's guilt or innocence was a matter for the jury to pass upon.

Assignment No. 2. The second assignment relates to a newspaper containing an article concerning the trial of this case which was found in the jury room. Appellant complains that his motion for a mistrial should have been granted.

The incident came to the notice of the trial court during a recess early in the trial. Upon the reconvening of court, but before the jury returned to the box, the following proceedings took place:

"The Court: There is an article in this morning's P. I. which states that the defendant is on parole from a conviction for rape in Kitsap County. Now, the jury has that paper, and, if any of the jurors have read it, I think it would be grounds for a mistrial. Mr. Regal: They have the newspapers? The Court: Well, yes, they have it, but I don't know whether they read it. Mr. Regal: I guess we will have to inquire. The Court: I rather think so. Mr. Regal: I don't know how they could have gotten it. I thought that was why we had bailiffs watching this. The Court: I instructed the bailiffs to cut out any article in regard to this trial, which apparently was overlooked. You may bring in the jury. . . ."

The court then asked each juror separately if he had read the article. All of them except juror No. 10 answered in the negative. This juror said:

"I just saw the headlines; I didn't read it. The Court: What were the headlines? Juror # 10: I didn't read it. Just a top line I read, is all. The Court: What did it say? Juror # 10: It—just about the trial, something about the trial. I don't know what it said. I didn't read it. . . .

The Court: Yes. There is only one of the jurors that took notice of this article about this trial and that's Juror No. 10, is that right? Juror # 10: Pardon? The Court: You are the only one that said they read the article or saw the article about this trial in the paper. Juror # 10: Well, I just saw the heading of it and that's all. I didn't read it. The Court: What did the heading say? Juror # 10: Well, I just—I just saw the top, and I can't even recall that. I just saw the heading that is this case, and that was all. I didn't read it. The Court: Well, you would have to read something about it to know that it referred to this case. Juror # 10: Well, I just saw it, that it was just this case; that was all. I just glanced down and that was all. I didn't read it. The Court: You don't know what it contained? Juror # 10: No, I do not. The Court: Very well. . . . "

The article was read into the record. It contained a resume of the prosecutor's opening statement (which the jury had already heard) and near the bottom of the article appeared this statement:

" 'He is on parole from a prison sentence for attempted rape in Kitsap County.' "

When the jury was again brought in, the court further interrogated juror No. 10 as follows:

"The Court: May I ask Juror No. 10 why you didn't read all of the article? Juror # 10: Well, I wasn't supposed to, they said, and I just happened to glance down, and I didn't read all of it. The Court: Very well. You may call your next witness."

The sole issue on this assignment is whether appellant was prejudiced by the conduct of the jury. Here, only one juror had read any part of the article, and she (No. 10) stated that she had only glanced at it and did not know what it contained.

If there had been any showing that she (or any juror) had read the sentence near the end of the article relating to appellant's alleged parole from a conviction of attempted rape in Kitsap County, the situation would be very different.

The trial court, after interrogating the jurors, was convinced that none of them had read the sentence relating

to appellant's prior conviction. The motion for mistrial, was, therefore, denied.

In their briefs, the parties refer to several of our decisions relating to the effect of various acts of alleged misconduct of jurors in criminal cases.

The case most nearly in point is *State v. Adamo,* 128 Wash. 419, 223 Pac. 9 (1924). In that case, the jurors, upon being questioned by the court, all denied having read the newspaper article in question. After a verdict of guilty of murder, one juror made an affidavit, in support of a motion for new trial, that he had read the article, including a statement that the defendant had been convicted in a previous trial on the same charge. The motion was denied, and this court affirmed the conviction.

In stating its reasons for affirmance, this court said at page 423:

"The granting of a new trial because of the alleged misconduct of jurors is in the discretion of the trial court and we will not interfere unless we are convinced that the discretion has been abused. Here we do not find any such abuse. As previously stated, the courts seem to be practically unanimous that in civil cases misconduct such as is involved here is not cause for a new trial. If such conduct is not prejudicial in a civil case, it cannot be in a criminal case.

"Persons charged with crime have an undoubted right to a fair trial before a fair jury, but it does not follow that a new trial must be granted because of every slight misstep or deviation from the customary rules governing trials."

Appellant relies on the recent decision of the United States Supreme Court in *Marshall v. United States,* 360 U. S. 310, 3 L. Ed. (2d) 1250, 79 S. Ct. 1171 (1959), in which a new trial was ordered in a United States District Court because newspaper articles, which mentioned that the defendant had two prior felony convictions, were read by some of the jurors. As to the general rule applicable in such situations, the court said, at p. 312:

"The trial judge has a large discretion in ruling on the issue of prejudice resulting from the reading by jurors of news articles concerning the trial. *Holt v. United States,*

218 U. S. 245, 251. Generalizations beyond that statement are not profitable, because each case must turn on its special facts. . . ."

In the case before us, since there is no showing that *any* juror had read the sentence in the article, which might have been considered prejudicial to appellant's having a fair trial, there was no abuse of discretion by the trial court, in denying appellant's motion for a mistrial. *State v. Adamo, supra.*

Assignments Nos. 3 and 4. In these assignments, appellant contends that the court erred in denying appellant's challenge to the sufficiency of the state's evidence made at the close of the state's case. The trial court did not err in holding that the state had, by the testimony and exhibits admitted in evidence (550 pages of the statement of facts), made a prima facie case for the jury. After this motion was denied, appellant introduced in evidence copies of the two wills above referred to and rested. He then renewed, without further argument, his challenge to the sufficiency of the evidence, which was again denied.

The circumstantial evidence, if believed by the jury, was sufficient to support a verdict of guilty of either first-degree murder or second-degree murder. Hence, there was no error in denying these challenges.

Appellant did not attempt to differentiate between second-degree murder and first-degree murder or between premeditated and felony murder in making his challenges to the sufficiency of the evidence. The motions and argument merely referred to "*the* charge alleged in the information." Our discussion of the evidence in reference to the separate elements in premeditated and felony murder is thus deferred to the consideration of appellant's next two assignments of error.

Assignments Nos. 5 and 6. These assignments raise an important question as to whether the trial court erred in giving instruction No. 5.

After both parties had rested, the court, in the absence of the jury, submitted his proposed instructions to counsel in order that each might state his exceptions thereto.

The state strenuously objected to the court's proposed instruction No. 2, in which the court proposed to quote only the first paragraph of the information (relating to premeditated murder) and to omit any reference to the portion of the information charging felony murder, *i.e.* that the killing occurred while appellant was engaged in committing or attempting to commit the crime of rape.

As we understand from the discussion of court and counsel (which takes up approximately 15 pages of the statement of facts), the court, in its proposed instructions, was intending to instruct the jury that there was insufficient evidence submitted by the state as to the alleged felony murder, and, therefore, it proposed to withdraw that part of the charge from the jury's consideration.

The state also pointed out that the court's proposed instructions did not contain any instruction regarding the included offense of second-degree murder.

At the close of the discussion, the trial court, addressing counsel, said:

"Proceed. I am not so sure that the Court is about to commit the serious error which you claim it is."

The court apparently was convinced by the prosecutor's argument, because, in instruction No. 5, it included the elements of both premeditated murder and felony murder (rape or attempted rape), and instructed the jury that, if the state had proven by the evidence, beyond a reasonable doubt, the essential elements (set forth in the instruction) of either or both of the alternative ways of committing first-degree murder, the jury "will return a verdict of guilty of murder in the first degree."

Appellant, in assigning error to the giving of this instruction, argues that:

1. There was insufficient evidence of premeditation.

2. There was insufficient evidence of rape or attempted rape.

As to the first element (premeditation), the state presented evidence (see testimony of the autopsy surgeon quoted above) from which the jury could find that there

was premeditation. His testimony tended to show that Mrs. May had been struck on the head several times with a blunt instrument with such force that in one place her skull had been fractured into her brain. Also, additional blows had severely damaged one ear and cheek and fractured her jaw, breaking two teeth. After this terrific beating, her assailant, while she was still alive, tied the vacuum cleaner cord around her neck and strangled her, which was the immediate cause of her death, in the opinion of the autopsy surgeon.

In *State v. Gaines,* 144 Wash. 446, 258 Pac. 508 (1927), this court, in a homicide case which involved a similar beating and choking, held that the jury could infer premeditation from the circumstances of the killing. We there said, at p. 467:

" . . . The evidence shows that the deceased was first choked into insensibility to an extent which could have produced death. A choking, to have this effect, takes some appreciable time. After the deceased was choked into insensibility, her assailant went to a garbage dump nearby, got a rock, returned and inflicted the wounds upon the head. It cannot be held, under the facts and circumstances of this case, that there was no evidence from which the jury had a right to find deliberation or premeditation. It is true that proof of the fact of killing, alone, does not raise a presumption of premeditation or deliberation, but premeditation or deliberation may be inferred from the circumstances of the killing. 30 C. J. 142."

We recently held, in *State v. Ross,* 56 Wn. (2d) 344, 351, 353 P. (2d) 885 (1960) (a first-degree murder case), that:

"It is necessary for an appreciable period of time to elapse for premeditation to exist. *State v. Horner,* 21 Wn. (2d) 278, 150 P. (2d) 690. Whether it existed in this case was a question for the jury."

See, also, *State v. Shirley,* 60 Wn. (2d) 277, 373 P. (2d) 777 (1962).

In the present case, the jury could have found from the evidence that an appreciable period of time had elapsed between the first blow of the beating and the choking to permit the perpetrator to form an intent to kill Mrs. May.

As to the sufficiency of the evidence of rape or attempted rape, we do not find it necessary to review the state's evidence in detail. We have carefully read the evidence bearing on this issue, and are convinced that at least it was sufficient, if believed by the jury, to justify the jury in finding that the perpetrator of this homicide was then engaged in an attempt to commit rape.

Appellant relies on *State v. Charley*, 48 Wn. (2d) 126, 291 P. (2d) 673 (1955), which he argues is directly in point. The defendant in that case was charged with sodomy, and this court reversed the conviction with directions to dismiss the charge because the state's evidence was reasonably susceptible of the conclusion that only an attempt was made.

In the present case, it is immaterial whether appellant consummated the rape or only attempted it. The jury could have found from the state's evidence that appellant was committing either offense at the time of the homicide.

By instruction No. 17 (to which no exception was taken), the jury were told the difference between direct and circumstantial evidence. Regarding the latter, they were instructed as follows:

". . . Circumstantial evidence is legal and competent as a means of proving guilt in a criminal case; each and every circumstance must be proved beyond a reasonable doubt; the circumstances must be consistent with each other, consistent with the guilt of the party charged, inconsistent with his innocence and inconsistent with every other reasonable hypothesis, except that of guilt, and when circumstantial evidence is of that character it is alone sufficient to convict.

"If the evidence can be reconciled either with the theory of innocence or guilt, the law requires that the defendant be given the benefit of the doubt and that the theory of innocence be adopted by the jury. You cannot speculate, surmise, or guess that the defendant is guilty."

We must presume, in the absence of any contrary indication in the record, that the jury applied this instruction to the evidence and arrived at its verdict in this case. We, therefore, hold that the trial court did not err when it

changed its mind and gave instruction No. 5 in the form originally proposed by it. ·

It follows that there was no error in giving instruction No. 8, which defined rape and attempted rape.

Assignment No. 7. In this assignment, appellant complains that instruction No. 9 was erroneous. By this instruction, the jury were told that, before they could convict appellant of murder in the first degree, the state had to prove beyond a reasonable doubt that he had struck and choked Belle May "with a design to effect her death," and that the jury must be convinced beyond a reasonable doubt that he "did have such a design to kill the deceased."

Appellant's trial counsel's exception to instruction No. 9 was as follows:

"And I except to Instruction No. 9, 'before you can convict the defendant of the crime charged, that is, murder in the first degree,' etc., because here they have charged in the alternative both premeditation and the statutory crime of attempted rape.

"I likewise, upon the same grounds except to No. 10."

We see no error in instruction No. 9 in the particular noted in the trial counsel's exception, to wit, that appellant was charged with two alternative ways of committing first-degree murder. In appellant's brief, it is stated, in reference to this instruction:

"Appellant's argument under assignment of error no. 3 applies in this regard and will not be repeated."

From what we have said above, in reference to assignments of error Nos. 3, 5, and 6, it is apparent that there is no merit in appellant's argument in support of assignment No. 7.

Assignment No. 8. As indicated in the above quotation from the trial counsel, the only exception taken to instruction No. 10 was that it was erroneous for the same reasons as those stated with respect to instruction No. 9. In his brief, appellant makes the argument that instruction No. 10 regarding second-degree murder was erroneous for somewhat more elaborate and different reasons than stated to the

trial court. The first paragraph of instruction No. 10 reads as follows:

"You are instructed that if the jury should unanimously conclude from the evidence, or lack of evidence, introduced at the trial that the defendant is not guilty of the crime of murder in the first degree, as defined in either subdivision A or B as set forth in instruction No. 5, then you may consider whether or not the defendant is guilty of the crime of murder in the second degree."

The remainder of the instruction defines murder in the second degree.

■ Assuming, arguendo, that the question is properly before us, and that instruction No. 10 was erroneous, it was not prejudicial, since appellant was convicted of murder in the first degree and not of the lesser included offense of murder in the second degree.

In *State v. Schoel*, 54 Wn. (2d) 388, 341 P. (2d) 481 (1959), the defendant was charged with murder in the first degree and his trial resulted in a conviction of murder in the second degree. The trial court granted him a new trial. Upon the second trial he was convicted of murder in the first degree. His motion to dismiss the first-degree charge, on the ground that the verdict in his first trial (guilty of second-degree murder) was an acquittal of the original first-degree murder charge, was denied by the trial court. He appealed to this court, contending that his second trial constituted double jeopardy in regard to the first-degree charge.

This court overruled a prior decision holding to the contrary, and after describing the proceedings at the two trials in some detail, said:

"No other conclusion can be reached than that the jury, by returning the verdict of guilty of the charge of murder in the second degree, did, in fact, return a verdict of not guilty of the greater offense of murder in the first degree. In other words, by finding the defendant guilty of second-degree murder, the jury acquitted the defendant of the higher offense charged, first-degree murder.

"This conclusion appears incontrovertible, since the jury, in following the instructions, determined as a matter of

fact that the defendant was guilty of no greater crime than that of murder in the second degree. The action of the jury, in fact, was eqivalent to the signing of a verdict of not guilty on the charge of murder in the first degree."

See, also *State v. Arnold*, 144 Wash. 367, 258 Pac. 20. (1927).

In the present case, since the jury convicted appellant of murder in the first degree, instruction No. 10, relating to the second-degree murder, was not prejudicial even if held to be erroneous.

Assignment No. 9 relates to instruction No. 11, which was the converse of instruction No. 10. It told the jury that, before they could find appellant guilty of second-degree murder, they must first unanimously find him not guilty of first-degree murder.

In view of what has already been said above regarding assignment No. 8, we find no merit in assignment No. 9.

Assignment No. 10 raises the question of whether the trial court erred in instructing the jury, in instruction No. 12, that they could not find him guilty of second-degree murder if they believed, from the evidence, that he committed the homicide while committing rape or attempting to commit it. It is argued that this instruction is in direct conflict with the last part of instruction No. 10.

Appellant's trial counsel took the following exception to the giving of instruction No. 12:

"I except to No. 12 as a comment upon the evidence. It is an attempt to add evidence in the case which was not before the Court or the jury when you incorporate 'in an attempt to commit, or in committing, rape,' and the committing of rape is entirely excluded and is not a matter for this jury to consider at all. The most they have charged is an attempt."

This exception is clearly insufficient to raise the question argued in this court, *i.e.* that the last part of instruction No. 10 is directly in conflict with instruction No. 12.

We have frequently held that *only* exceptions which are made to instructions in the trial court may be considered on appeal. *State v. Hinkley*, 52 Wn. (2d) 415, 325 P.

(2d) 889 (1958); *State v. Johnson*, 55 Wn. (2d) 594, 349 P. (2d) 227 (1960); *State v. Lyskoski*, 47 Wn. (2d) 102, 287 P. (2d) 114 (1955). Furthermore, if the exception taken is too general to be effective in calling the trial court's attention to any error, there can be no review of the alleged error on appeal. *State v. Wilson*, 38 Wn. (2d) 593, 231 P. (2d) 288 (1951); *State v. Collins*, 50 Wn. (2d) 740, 314 P. (2d) 660 (1957).

Applying these rules to appellant's exception to instruction No. 12, there was nothing to indicate to the trial court (as appellant now argues in his brief) that it limited the jury's choice of verdict or that it was in direct conflict with the latter part of instruction No. 10. For the reasons stated in our cases hereinbefore cited, we cannot pass upon these new arguments now raised in this court. The ground of the exception taken in the trial court that instruction No. 12 constituted a comment on the evidence is without merit.

Assignment No. 11. In this assignment, it is claimed that the trial court erred in refusing to give appellant's requested instruction No. 33, relating to the defense of alibi. Appellant relies on *State v. Brown*, 35 Wn. (2d) 379, 213 P. (2d) 305 (1949), and *State v. Coffelt*, 33 Wn. (2d) 106, 204 P. (2d) 521 (1949). In each of these cases, the defendant produced testimony (either his own or that of witnesses called by him) that, at the time the crime was shown by the state to have been committed, he was elsewhere. In such cases the defense of alibi is made an issue for the jury and the defendant is entitled, if he requests it, to a proper instruction concerning this defense.

In the case at bar, appellant introduced no testimony whatever as to his whereabouts at the time the alleged homicide was committed. We doubt whether, under these circumstances, the defense of alibi was an issue in the case.

However, assuming, arguendo, that the defense of alibi was properly raised and that the requested instruction correctly stated the applicable rule, we shall consider appellant's argument as to the alleged error in refusing to give his requested instruction No. 33.

The basis of appellant's argument that he claimed the defense of alibi at the trial was that the state had offered in evidence certain statements he orally made to the county detectives the evening after his arrest (a portion of the detective's written version of this interview has been quoted above). In this exhibit appellant, in describing his movements during the day of July 28, 1955, said that he was drinking some beer with Mrs. May (who was drinking wine) in her kitchen after he had finished several days' electrical work at her house. He then said (according to the detective's transcription):

"I left after that probably about 10:00 or 10:30 [a.m.] and I went directly to the Renton power company. . . ."

At the end of the transcription, he signed the exhibit under the last paragraph, which reads as follows:

"I've read the above statement, and to the best of my ability or knowledge it is true, except there may be some things I've forgotten, or the time mentioned above is approximate within one hour."

Even assuming that appellant's admissions or statements to the detectives can, in the absence of any evidence offered by him either pro se or by other witnesses, constitute a basis for the defense of alibi, the above-quoted portion of his statements do not tend to prove an alibi.

The state's evidence showed that the homicide was committed between 10 a.m. and noon on July 28. In his statements to the detectives, appellant admits that he was in the kitchen with Mrs. May until 10 or 10:30 a.m. He qualified this by saying, in the concluding paragraph, that the statements contained in the exhibit were true to the best of his knowledge except there may be some things he had forgotten or the time mentioned therein is approximate within one hour.

Consequently, he admits being with the homicide victim in her kitchen at the beginning of the 2-hour period when the homicide was committed and possibly for a half hour thereafter. Furthermore, if he was in error as to time "within one hour," appellant could have been at Mrs. May's house until as late as 11:30 a.m.

Therefore, there was no evidentiary basis for the defense of alibi, even if that defense be considered as otherwise available to him on this record. We hold that the trial court did not err in refusing to give requested instruction No. 33.

Assignments Nos. 12 and 13. These assignments do not require separate discussion since they relate to the denial of the usual post-trial motions. From what we have said in considering the other assignments of error, the trial court did not err in denying these motions.

After a thorough and exhaustive examination of the record, in the light of the various assignments of error made by appellant, we are convinced that he had a fair trial and, hence, the judgment and sentence entered by the trial court is hereby affirmed.

OTT, C. J., FINLEY, WEAVER, and HAMILTON, JJ., concur.

---

November 5, 1963. Petition for rehearing denied.