# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 54224-2-II |
| Respondent, | |
| v. | |
| DUSTIN ALAN GRIFFIN, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, A.C.J.—Dustin Alan Griffin and Kristopher Hoyt broke into Donald Howard's home. Howard unexpectedly returned home, interrupting the burglary. Griffin struck Howard on the back of the head with a baseball bat incapacitating him. Griffin removed jewelry from Howard's body and valuables from his pockets before hitting him additional times with the bat and, later, the stock of an assault rifle. Howard died from his injuries.

During the investigation into Howard's murder, detectives falsified a written confession, signing Griffin's name, to prompt Hoyt to confess. Hoyt ultimately testified against Griffin at trial, detailing how Griffin beat Howard. The jury found Griffin guilty of premeditated first degree murder with aggravating circumstances.

Griffin argues that the State failed to provide sufficient evidence to prove the murder was premeditated. Griffin also argues that the detectives committed police misconduct when they fabricated the statement from Griffin. Griffin filed a statement of additional grounds for review (SAG). Finally, Griffin filed supplemental briefing asking that this court remand for resentencing in light of our Supreme Court's recent decision to strike down Washington's strict liability drug

possession statute, former RCW 69.50.4013(1) (2017). *State v. Blake*, 197 Wn.2d 170, 481 P.3d 521 (2021).

We affirm Griffin's convictions but remand for resentencing and correction of Griffin's judgment and sentence in light of *Blake*.

FACTS

I. HOWARD'S DEATH

In November 2016, Griffin and Hoyt decided to break into Howard's home because they knew he had valuables. Howard was an avid fisherman who was known to go fishing almost every morning. Griffin and Hoyt drove to Howard's home in a stolen truck, and Griffin brought an assault rifle. They arrived in the middle of the night and waited to approach Howard's house until they saw Howard leave. After Howard left, Griffin and Hoyt broke in through a back window. They started gathering valuables.

Hoyt was in the office that was immediately to the left of the front door when he heard the front door being unlocked. As the door was opening, Hoyt tried to let Griffin know that someone was coming inside. The noise caught Howard's attention, and Howard moved toward Hoyt.

As Howard was confronting Hoyt, Griffin approached Howard from behind and hit the back of Howard's head with a baseball bat he had apparently found in Howard's home. Howard immediately fell to the floor and was incapacitated. Griffin removed Howard's jewelry and items in Howard's pockets, tied up Howard, and struck Howard with the baseball bat several more times. Griffin also moved Howard to the living room.

Griffin and Hoyt then took another 15 to 30 minutes to look for more valuables. Although Hoyt's testimony about the sequence of events was at times inconsistent, he testified that Griffin

struck a last blow to Howard's head with the stock of the assault rifle as they were leaving the house. Howard was still breathing when they left.

The next day, Griffin returned to Howard's house and set fire to it using accelerants. A neighbor called 911. Firefighters responded, extinguished the fire, and discovered Howard's body inside.

## II. INVESTIGATION

The investigation into Howard's death eventually led the detectives to suspect that Griffin and Hoyt were involved in Howard's murder. The detectives went to visit Hoyt, who was then incarcerated on different charges. About five minutes into their interview, the detectives presented Hoyt with a written confession purportedly from Griffin. The confession was, in fact, written and signed by the detectives. The confession alleged that Hoyt had killed Howard and forced Griffin to help him take valuables from Howard's home. Hoyt was shocked but initially declined to give a statement of his own. The detectives then showed Hoyt photos of Howard's beaten body. The detectives also took fingerprints and DNA samples from Hoyt.

As the detectives were preparing to leave, they told Hoyt to call them if he ever changed his mind and wanted to do the right thing. Hoyt then chose to make a statement consistent with the events described above. When Hoyt later learned that the detectives had falsified Griffin's confession, he did not change his story.

Hoyt pleaded guilty to first degree murder, first degree burglary, and first degree robbery. Hoyt agreed to testify at Griffin's trial in exchange for being able to withdraw his original plea and enter a plea of guilty to second degree conspiracy to murder, first degree burglary, and first degree robbery after his testimony.

The State charged Griffin with premeditated first degree murder with an aggravating circumstance, first degree felony murder, first degree burglary, first degree robbery, first degree arson, first degree unlawful possession of a firearm, and possession of a stolen vehicle. A firearm enhancement and deadly weapon enhancement were added to Griffin's murder, burglary, and robbery charges.

### III. TRIAL AND SENTENCING

Griffin's case proceeded to a jury trial. Hoyt testified consistent with the facts described above. The jury was told about Hoyt's plea agreement and the confession the detectives falsified.

A medical examiner testified that Howard suffered blunt force trauma to at least six different locations on his head. There were injuries to Howard's face, the back of Howard's head, and on both sides of his head. The blows to the back of his head were likely lethal. There were also injuries to Howard's chest that included broken ribs and bleeding in the chest wall. The medical examiner concluded that Howard lived, at most, a few hours after the beatings.

Finally, another witness testified that sometime around Thanksgiving 2016, near the time Howard's murder was discovered, she took a trip with Griffin and his girlfriend. On that trip, Griffin had a big, long gun in a long black case. The witness saw Griffin set the gun on a tripod and fire it. Hoyt also testified that Griffin brought an assault rifle with him to Howard's home and that Griffin had a tripod and a long, dark rifle case for the gun.

The jury found Griffin guilty on all counts. The jury also returned special verdicts finding the aggravating factors that Griffin committed the murder "to conceal the commission of a crime or to protect or conceal the identity of any person committing a crime" and "in the course of, in furtherance of, or in immediate flight from burglary in the first degree." Clerk's Papers (CP) at

112, 114. The jury also found Griffin was armed with a deadly weapon when he committed the murder, burglary, and robbery.

To avoid double jeopardy, the trial court vacated the felony murder conviction. At sentencing, Griffin's offender score included points for convictions for possession of a controlled substance. Griffin appeals his remaining convictions and sentence.

ANALYSIS

I. SUFFICIENCY OF THE EVIDENCE

Griffin contends the State failed to provide sufficient evidence that Griffin acted with premeditation when killing Howard. We conclude that, viewing the evidence in the light most favorable to the State, there was sufficient evidence of premeditation to sustain Griffin's premeditated first degree murder conviction.

A.      Standard of Review

The State is required to prove every element of an offense beyond a reasonable doubt. *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). If any rational trier of fact can find the essential elements of the crime beyond a reasonable doubt, after viewing the evidence in the light most favorable to the State, then the evidence is sufficient to support a conviction. *Id.*

Direct evidence and circumstantial evidence are equally reliable. *State v. Cardenas-Flores*, 189 Wn.2d 243, 266, 401 P.3d 19 (2017). "However, inferences based on circumstantial evidence must be reasonable and cannot be based on speculation." *State v. Vasquez*, 178 Wn.2d 1, 16, 309

P.3d 318 (2013). We defer to the trier of fact regarding any credibility determinations. *Cardenas-Flores*, 189 Wn.2d at 266.

B.       Premeditated Murder

To convict a defendant of premeditated first degree murder, the State must prove beyond a reasonable doubt that the defendant with premeditated intent caused the death of a person. RCW 9A.32.030(1)(a); *State v. Hummel*, 196 Wn. App. 329, 354, 383 P.3d 592 (2016). Premeditation requires "more than a moment in point of time." RCW 9A.32.020(1). The State must show "'the deliberate formation of and reflection upon the intent to take a human life'" with "'thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short.'" *Hummel*, 196 Wn. App. at 354 (quoting *State v. Hoffman*, 116 Wn.2d 51, 82-83, 804 P.2d 577 (1991)). "The 'mere opportunity to deliberate is not sufficient to support a finding of premeditation.'" *Id.* (quoting *State v. Pirtle*, 127 Wn.2d 628, 644, 904 P.2d 245 (1995)).

Four factors that are particularly relevant when establishing premeditation are: method, procurement of a weapon, stealth, and motive. *State v. DeJesus*, 7 Wn. App. 2d 849, 883, 436 P.3d 834, *review denied*, 193 Wn.2d 1024 (2019). However, a "wide range" of other factors can also be relevant and can "support an inference of premeditation." *State v. Aguilar*, 176 Wn. App. 264, 273, 308 P.3d 778 (2013) (citing *State v. Finch*, 137 Wn.2d 792, 831, 975 P.2d 967 (1999)). Thus, we consider the totality of the circumstances. *See State v. Ollens*, 107 Wn.2d 848, 855, 733 P.2d 984 (1987) (Callow, J., concurring in result) (describing the jury's evaluation of whether a killing was premeditated as "the evaluation of the totality of the evidence in the light of all of the surrounding circumstances"). The State may use circumstantial evidence to prove premeditation if the "inferences supporting premeditation are reasonable and the evidence is substantial." *State v.*

*Gregory*, 158 Wn.2d 759, 817, 147 P.3d 1201 (2006), *overruled on other grounds by State v. W.R.*, 181 Wn.2d 757, 336 P.3d 1134 (2014).

C.      Sufficient Evidence Supported Premeditation

Griffin contends the murder was impulsive and spontaneous, not premeditated. Griffin argues there were no prior threats or quarrels between Griffin and Howard, Howard did not have any defensive wounds, and Griffin did not appear to have brought the bat to Howard's house. Griffin also argues that even if "it took an appreciable amount of time to kill Mr. Howard" it only shows there was time to deliberate, not that Griffin actually deliberated. Reply Br. of Appellant at 1.

Griffin relies on *State v. Bingham*, 105 Wn.2d 820, 719 P.2d 109 (1986), to contend that the State failed to prove premeditation. In *Bingham*, the Washington Supreme Court considered whether there was sufficient evidence to prove premeditation in a strangulation case. *Id.* at 822-23. The State noted that manual strangulation takes three to five minutes and argued that was sufficient to show there was an appreciable amount of time for Bingham to have deliberated. *Id.* at 824. The court explained that proving there was the opportunity to deliberate does not prove that the murder was deliberate or that the defendant reflected before or during the strangulation. *Id.* at 827. The court concluded that the evidence of manual strangulation alone was insufficient to support a finding of premeditation. *Id.* at 828.

A year after *Bingham*, the Supreme Court again considered whether there was sufficient evidence to prove the defendant acted with premeditation in *Ollens*, 107 Wn.2d at 853. The *Ollens* court noted several factors that distinguished that case from *Bingham*. *Id.* First, manual strangulation is one continuous act, but Ollens stabbed the victim numerous times and then slashed

the victim's throat. *Id.* The subsequent slashing, the court reasoned, was an indication the defendant did in fact premeditate on his already formed intent to kill. *Id.* The defendant had procured a weapon to kill the victim. *Id.* The jury could have found that the defendant struck the victim from behind, with stealth being another indication of premeditation. *Id.* Finally, the jury could have found robbery to be a motive. *Id.* After considering these factors, the court concluded there was sufficient evidence to sustain premeditation. *Id.*

More recently, in *State v. Allen*, 159 Wn.2d 1, 7-8, 147 P.3d 581 (2006), Allen argued that the State failed to prove he acted with premeditation when he beat and strangled the victim. The court considered the "'appreciable period of time'" of the physical struggle with the victim prior to the strangulation. *Id.* at 8 (quoting *State v. Harris*, 62 Wn.2d 858, 868, 385 P.2d 18 (1963)). The altercation also took place in multiple rooms and involved pushing and wrestling. *Id.* Even though Allen did not bring a weapon with him, he used multiple weapons—first Allen strangled the victim with a phone cord, then he beat her with a rifle. *Id.* The defendant also had to retrieve the rifle from a cabinet. *Id.* The fact that the victim was struck from behind also supported premeditation. *Id.* The Supreme Court concluded there was sufficient evidence of premeditation. *Id.* at 9.

Here, there was sufficient evidence to support a finding that Griffin acted with premeditated intent when he killed Howard, considering the method of the killing, weapons were used, there was stealth, and there was motive. First, Griffin hit Howard multiple times. *See Ollens*, 107 Wn.2d at 853. Howard had injuries in six different locations and on both sides of his head, indicating that Griffin stopped and repositioned before striking Howard again. Even if Howard did not have defensive wounds, he was incapacitated from behind with the first blow. Had Griffin stopped after the first blow, we might come to a different conclusion, but Griffin continued to beat

Howard over an appreciable period of time, and Griffin stopped between blows to remove Howard's jewelry and wallet and later to sweep the house again before delivering the final blow. There was testimony supporting a gap of at least 15 minutes between the first beating and the final blow.

Second, Griffin used two weapons. Griffin brought a firearm to Howard's house. He also procured a baseball bat, apparently on the premises, prior to hitting Howard. *Allen*, 159 Wn.2d at 8. Griffin used both weapons—he put down the bat, picked up his gun, and struck the final blow with the stock of his gun.

Third, Griffin used stealth, sneaking up behind Howard and striking him on the back of the head. Stealth is a significant factor that courts have considered when determining whether there was premeditation. *Ollens*, 107 Wn.2d at 853; *Allen*, 159 Wn.2d at 8.

Finally, there was evidence of multiple relevant motives. The jury found that Griffin committed the murder "to conceal the commission of a crime or to protect or conceal the identity of any person committing a crime." CP at 112. The jury also found that Griffin murdered Howard "in the course of, in furtherance of, or in immediate flight from burglary in the first degree." CP at 114. Although there was no evidence of prior animosity between Griffin and Howard, that does not defeat premeditation here, where Griffin committed murder to ensure he would not be caught for burglary.

Considering all of the circumstances, there is sufficient evidence to support premeditation, especially considering the evidence in the light most favorable to the State. Most importantly, the beating involved multiple blows occurring over a significant period of time when Griffin paused twice to take Howard's valuables and sweep the house. Given these facts, there was sufficient

9

evidence that Griffin could reflect on his actions. Therefore, we conclude there was sufficient evidence of premeditation.

## II. ALLEGED POLICE MISCONDUCT

Griffin contends the police engaged in outrageous conduct that violated his right to due process when they presented Hoyt with a forged confession, allegedly signed by Griffin, implicating Hoyt as the murderer. Griffin argues that all of his convictions must be dismissed because they were tainted by this police misconduct. We conclude that the falsification of the confession did not constitute police misconduct.

A.    Police Misconduct

Police conduct during an investigation can be so outrageous as to violate due process. *State v. Lively*, 130 Wn.2d 1, 20-21, 921 P.2d 1035 (1996). "Dismissal is appropriate only in the most egregious of cases" that "shock the universal sense of fairness." *State v. Athan*, 160 Wn.2d 354, 377, 158 P.3d 27 (2007); *Lively*, 130 Wn.2d at 19.[1]

Courts review the conduct under the "'totality of the circumstances.'" *Lively*, 130 Wn.2d at 21 (quoting *United States v. Tobias*, 662 F.2d 381, 387 (5th Cir. 1981)). Each claim must be resolved on its unique set of facts, after evaluating each component of the government's conduct. *Id.* The court's focus must be on the State's conduct, not the defendant's predisposition, and the court must keep in mind "'proper law enforcement objectives—the prevention of crime and the apprehension of violators, rather than the encouragement of and participation in sheer lawlessness.'" *Id.* at 21-22 (quoting *People v. Isaacson*, 44 N.Y.2d 511, 406 N.Y.S.2d 714, 378

---

[1] Griffin does not argue CrR 8.3 as a basis for this claim. He asserts only a due process violation.

N.E.2d 78 (N.Y. 1978)). Whether the police engaged in outrageous conduct is a matter of law. *Id.* at 19.

B.     Fake Confession

As an initial matter, the State argues Griffin waived this argument since he did not raise it below. Griffin contends that he can raise outrageous police conduct for the first time on appeal because it is a constitutional error that impacts his due process right. Our Supreme Court has established that a defendant can raise a police misconduct claim for the first time on appeal. *Id.* at 18-19.

Both Griffin and the State discuss *Lively*. However, *Lively* involved very different facts. In *Lively*, an informant attended alcoholics anonymous and narcotics anonymous meetings "'trolling for targets.'" *Id.* at 22-23. Lively had no criminal history or any connections to criminal activity, but the informant still initiated a relationship with Lively. *Id.* at 23. Lively was emotionally fragile and became dependent on the informant. *Id.* at 23, 26. After Lively moved in with him, the informant asked Lively to obtain narcotics for him, which Lively did. *Id.* at 25. The court concluded that, considering the totality of the circumstances, this amounted to police misconduct. *Id.* at 21, 27. The government took advantage of a mother raising two young children alone who was trying to stay sober. *Id.* at 27. The court emphasized that people should not be victimized while they are seeking help. *Id.*

In contrast, the Supreme Court has concluded that fabricating a document to deceive a suspect was not so outrageous to warrant reversal. *Athan*, 160 Wn.2d at 363, 378. In *Athan*, the police re-examined DNA evidence that had been found in a 20-year-old cold case. *Id.* at 363. The detectives tricked a suspect by posing as a law firm. *Id.* The detectives sent the suspect a fake law

firm letter inviting the suspect to join a class action case. *Id.* The suspect returned a form, and the police were able to obtain the suspect's DNA from the saliva on the envelope flap. *Id.*

The court explained that deceitful conduct is allowed in an investigation and that Athan voluntarily relinquished the envelope with his DNA. *Id.* at 377. Even though the police had violated a statute by posing as attorneys, the ruse was not used to obtain confidential information. *Id.* at 377-78. Finally, the police did not seek to induce Athan into committing any criminal activity. *Id.* at 378. This conduct was not so egregious as to violate due process. *Id.*

Here, although fabricating a document to trick Hoyt was deceptive, it was not so egregious that it violated due process. The detectives presented Hoyt with the confession and he initially seemed shocked, but other things, like the collection of his DNA and fingerprints, and the photos of Howard's beaten body, were relevant to his decision to talk to police. The detectives did not use a fake confession to induce Hoyt to commit a crime. *Id.*; *Lively*, 130 Wn.2d at 23-25. Unlike *Lively*, the detectives did not seek out an innocent and emotionally fragile individual with no criminal background who was seeking assistance. 130 Wn.2d at 23. Instead, the detectives talked with Hoyt because they believed he was connected to the case. At most, the detectives lied to Hoyt and fabricated a document, which is insufficient to establish misconduct under *Athan*. 160 Wn.2d at 363, 378.

Griffin asserts that the detectives participated in illegal activity, specifically identity theft and forgery, when they falsified Griffin's confession. To prove identity theft under RCW 9.35.020, one is required to show that the individual intended to commit or aid and abet a crime. Similarly, to be convicted of forgery, the individual must have intended to injure or defraud someone. RCW 9A.60.020. Here, there is nothing in the record to indicate that the detectives were intending to

commit a crime, injure someone, or defraud anyone. The deception was not "the encouragement of and participation in sheer lawlessness." *Lively*, 130 Wn.2d at 21.[2]

Griffin also argues that we should adopt the bright-line rule in a New Jersey case, *State v. Patton*, 362 N.J. Super. 16, 48, 826 A.2d 783 (App. Div. 2003), prohibiting police fabrication of physical evidence to trick suspects. In *Patton*, the court invalidated the use of a fabricated audiotape to prompt a confession. *Id.* at 18, 48. But rather than a bright-line rule, our Supreme Court has considered the totality of the circumstances. *Lively*, 130 Wn.2d at 21. And in *Athan*, the use of a falsified document to trick a suspect was not a due process violation. 160 Wn.2d at 378. We decline to follow *Patton.*

Although certainly deceptive, providing a suspect with a falsified confession does not "shock the universal sense of fairness" nor is this a "most egregious" case. *Athan*, 160 Wn.2d at 377; *Lively*, 130 Wn.2d at 19-20. Therefore, we conclude the detectives' use of a falsified confession did not violate due process.[3]

## III. OFFENDER SCORE

Griffin argues that his sentence must be reversed and his case should be remanded for resentencing because his three convictions for unlawful possession of a controlled substance must be stricken from his offender score. The State acknowledges that "it would be appropriate to correct Griffin's offender score." Suppl. Br. of Resp't at 8. But the State argues resentencing is

---

[2] Griffin also claims the detectives violated the Fourth Amendment to the United States Constitution when they "seized" Griffin's signature. But he provides no valid legal support for the notion that signing someone's name is a seizure under the Fourth Amendment.

[3] The State also contends that Griffin does not have standing to challenge a ruse to trick Hoyt. We need not address that issue.

unnecessary because Griffin was convicted of aggravated first degree murder, which means Griffin is serving a life sentence without the possibility of parole, and Griffin would still have an offender score that is well above 9.

In *Blake*, the Supreme Court held that Washington's strict liability drug possession statute, former RCW 69.50.4013(1), violates state and federal due process clauses and is therefore void. 197 Wn.2d at 195. A conviction based on an unconstitutional statute cannot be considered in calculating the offender score. *See State v. Ammons*, 105 Wn.2d 175, 187-88, 713 P.2d 719, 718 P.2d 796 (1986). Griffin's offender score included three unlawful possession of a controlled substance convictions, which now must be stricken from Griffin's offender score. Griffin's criminal history, which listed the unconstitutional convictions, was incorporated into his judgment and sentence. Accordingly, Griffin's judgment and sentence should be corrected.

Finally, given that Griffin's offender score included unconstitutional convictions, Griffin should also be resentenced. We recognize that Court of Appeals cases have been inconsistent in determining whether resentencing is warranted in these circumstances. In *State v. Argo*, 81 Wn. App. 552, 569, 915 P.2d 1103 (1996), Division One held that an erroneous offender score that does not affect the standard range is harmless. And this court has previously explained that "a *reduced standard range*, not a reduced offender score, requires resentencing on remand." *State v. Kilgore*, 141 Wn. App. 817, 824, 172 P.3d 373 (2007) (footnote omitted). But in *State v. McCorkle*, the State failed to prove comparable foreign convictions, resulting in a miscalculation of the offender score that did not affect the standard sentence range. 88 Wn. App. 485, 498-99, 945 P.2d 736 (1997), *aff'd*, 137 Wn.2d 490 (1999). We held the error was not harmless because "the record

does not clearly indicate that the sentencing court would have imposed the same sentence without the [unproved convictions] and the resultant change in offender score." *Id.* at 499-500.

Griffin's offender score will still be greater than 9. However, we also consider whether the defendant was sentenced at the bottom of the standard range. If the trial court imposed a low-end sentence and a reduction of the offender score could not result in a lower sentence within the standard range, then resentencing is not necessary. *E.g.*, *State v. Johnson*, 61 Wn. App. 539, 552, 811 P.2d 687 (1991). However, here, the trial court did not impose the minimum sentence on any of Griffin's convictions, so we recognize the trial court has discretion to impose a different sentence within the standard range for several of Griffin's convictions. And although Griffin's most severe sentence will not change, we recognize that his remaining sentences matter because, for example, although rare, a conviction or sentence can be overturned on collateral review, making concurrent sentences relevant.

We remand for the trial court to correct Griffin's judgment and sentence and resentence him in accordance with *Blake*.

IV. STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW—FIREARM POSSESSION

Griffin argues the State failed to prove that Griffin possessed a firearm because it never produced evidence that Griffin ever represented he possessed a firearm. Griffin also argues that only one witness testified that the firearm was operational and that witness could not say whether the weapon was an actual firearm or a pellet gun. A pellet gun, Griffin contends, does not meet the definition of "firearm." Finally, Griffin argues that none of the witnesses claimed they saw an actual firearm in Griffin's possession and, instead, the witnesses gave a "very general description of a black military style rifle." SAG at 6.

Former RCW 9.41.040(1)(a) (2016) provides that a person is guilty of unlawful possession of a firearm in the first degree if that person owns, or has in his possession any firearm after being convicted of any serious offense as defined in chapter 9.41 RCW. A firearm is "a weapon or device from which a projectile or projectiles may be fired by an explosive such as gunpowder." Former RCW 9.41.010(9) (2015).

Considering all the testimony at trial, there was sufficient evidence to sustain Griffin's unlawful possession of a firearm conviction. Hoyt testified that he saw Griffin with an assault rifle when they went to Howard's home in November 2016. Hoyt also noted that Griffin had a tripod for the gun and a long, dark rifle case. Another witness, who took a trip with Griffin and his girlfriend around Thanksgiving 2016, testified that she saw Griffin with a big long gun, a long black gun case, and a tripod for the gun. That witness also saw Griffin shoot that gun during the trip. This evidence was sufficient to sustain Griffin's conviction for unlawful possession of a firearm.

## CONCLUSION

We affirm Griffin's convictions but remand for the trial court to correct Griffin's judgment and sentence and resentence him.

No. 54224-2-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, A.C.J.

I concur:

Veljacic, J.

17

No. 54224-2-II

SUTTON, J. (concur in part/dissent in part) — I respectfully concur in part and dissent in part. Griffin was convicted of aggravated first degree murder and the court imposed the statutory mandate of life without parole under RCW 9.94A.515. I agree with the majority that the State provided sufficient evidence to prove that the murder was premediated, that the detective did not commit police misconduct, and that Griffin's SAG has no merit, and thus, I agree with the majority to affirm his convictions. I also agree with the majority that a remand to the sentencing court to determine the impact of *State v. Blake* on Griffin's offender score is appropriate.

However, I disagree with the majority that a remand for resentencing is necessary. Except for his aggravated first degree murder conviction, Griffin's other convictions received standard range sentences. I agree with the State that removing the points for the possession of controlled substance convictions from Griffin's offender score will not affect his standard ranges for the other convictions. As to the aggravated first degree murder convictions, his life sentence is mandatory regardless of his offender score, and thus, I would hold that a remand is unnecessary. For these reasons, I respectfully concur in part and dissent in part.

_____
SUTTON, J.