[No. 25193-4-III.   Division Three.   July 1, 2008.]

THE STATE OF WASHINGTON, *Respondent*, v. KENITH WAYNE
SHERRILL, *Appellant*.

*Stephanie C. Cunningham*, for appellant.

*Ronald S. Zirkle, Prosecuting Attorney*, and *Kevin G. Eilmes, Deputy*, for respondent.

¶1 KULIK, J. — Kenith Wayne Sherrill challenges the sufficiency of the evidence supporting premeditation for his conviction of first degree murder of his girl friend. We conclude that the evidence of premeditation is sufficient to support the conviction and affirm.

## FACTS

¶2 Kenith Sherrill and Teressa Hilton lived together for approximately three years. The couple had a history of

domestic violence during the last year and one-half of their relationship. When the couple fought, Ms. Hilton often called her friend Peggy Sue Darden to pick her up. Ms. Darden noted that Ms. Hilton had bruises on her body and face, and bald spots on her head where Mr. Sherrill ripped out her hair. In September 2003, Ms. Hilton was treated in a Wenatchee emergency room after Mr. Sherrill beat her into unconsciousness. Six months later, Mr. Sherrill was arrested in Wenatchee after a passerby saw Mr. Sherrill trying to restrain Ms. Hilton in his car as she struggled to get out.

¶3 In the summer of 2004, Mr. Sherrill and Ms. Hilton moved from Wenatchee to Sunnyside, where they lived in a motor home parked in the backyard of Mr. Sherrill's adult son. The motor home faced the adjoining property of Shirley and Allen Reavis, and sat just a few feet from the fence. The Reavises noticed scratches and bruises on Ms. Hilton's face when she came over for a July 4 barbeque.

¶4 On July 6, 2004, Mr. Sherrill's son was away on a fishing trip with his family. Mr. Reavis spent the day doing yard work. At about 3:00 or 4:00 PM, Ms. Reavis visited Ms. Hilton in the motor home. They watched television and talked while Mr. Sherrill worked in the shop.

¶5 At 6:00 PM, Ms. Reavis saw Ms. Hilton fall backward out of the motor home, landing on her back upon the concrete patio. Mr. Sherrill was on the steps, trying to catch Ms. Hilton's fall. Mr. Sherrill helped Ms. Hilton back into the motor home. About 90 minutes later, Ms. Reavis went to check on her neighbor. She found Ms. Hilton lying on the floor in the front area of the motor home. Ms. Hilton appeared happy and in a good mood, but she acted as though her back bothered her.

¶6 When it was almost dark, Mr. Reavis turned off his lawn mower. As both he and his wife were heading into their house at about 9:00 PM, they heard moaning coming from the motor home. Mr. Reavis went outside to quiet his barking dog at about 11:00 PM and saw Mr. Sherrill standing in front of the trailer with his hands on his head, yelling

profanities. Mr. Reavis went in the house and told his wife that there was something going on next door. Ms. Reavis went into the motor home and found Ms. Hilton, her face "all black and blue," lying on the floor in the back of the trailer.[1] Mr. Sherrill was on the telephone to 911 and was trying to give Ms. Hilton cardiopulmonary resuscitation (CPR).

¶7 When police and paramedics arrived at about 11:30 PM, they found Ms. Hilton's bloody body on the floor. Efforts to resuscitate Ms. Hilton were unsuccessful. Mr. Sherrill's dentures were broken in two, lying under the body. Mr. Sherrill was upset, crying, and covered with blood. He smelled of intoxicants. Mr. Sherrill said that he and Ms. Hilton had been drinking and got into a fight, then she "spaced out" and quit breathing.[2]

¶8 Police arrested Mr. Sherrill. He was ultimately charged with first degree murder and violation of a protection order.

¶9 Mr. Sherrill waived his constitutional rights and said that he wanted to talk to police. He said he tried to resuscitate Ms. Hilton. During a police interview the following day, Mr. Sherrill stated that he had fallen down and gotten his blood all over Ms. Hilton when he tried to give her CPR. He later asserted that he and Ms. Hilton had argued, that she had fallen down, and that her death was an accident. In taped statements, Mr. Sherrill denied that he and Ms. Hilton were fighting, but he stated that she fell down backward and hit her head on the table at about 4:00 PM. When confronted with the evidence of blood at the scene, he stated that he blacked out and did not remember what happened. Mr. Sherrill's right hand was swollen and stained with Ms. Hilton's blood.

¶10 Forensic scientists found blood spatter in several distinct locations around the trailer, including the kitchen, bathroom, living room, on appliances, on the carpet, and

---

[1] Report of Proceedings (RP) (Feb. 2, 2006) at 187.

[2] RP (Feb. 1, 2006) at 41.

high and low on the walls. Clumps of hair were found throughout the trailer and outside the trailer. Blood and imbedded hair were on the VCR (videocassette recorder), the television receiver, and a step outside the trailer. Blood spatter was also found on the trailer's wheels. The pattern of blood spatters was not consistent with a fall.

¶11 Ms. Hilton's autopsy revealed at least 42 separate blunt impact injuries. She suffered internal injuries to her brain and abdominal areas, several fractured ribs, a lacerated liver, and significant internal bleeding in her chest area. The cause of death was multiple internal injuries due to the blunt impact to the head, chest, and abdomen.

¶12 Rick Hoffman was appointed as Mr. Sherrill's counsel on July 7, 2004, but Mr. Hoffman was ordered to withdraw on July 16, when a conflict of interest was discovered concerning Mr. Hoffman and a State's witness.

¶13 Timothy D. Cotterell was assigned as Mr. Sherrill's counsel on July 22, 2004. On August 4, Mr. Cotterell advised the court that Mr. Sherrill no longer wanted him to be involved in his representation. Mr. Sherrill advised Judge C. James Lust that Mr. Cotterell was "prejudiced"[3] and trying to set Mr. Sherrill up, Mr. Sherrill wanted nothing to do with Mr. Cotterell or any other court-appointed lawyer, and Mr. Sherrill wanted to represent himself. Mr. Sherrill also claimed that Mr. Cotterell was acting inappropriately by asking for a trial when Mr. Sherrill did not need a trial and it was the State's job to take the case to trial. Mr. Sherrill asserted that he was arrested on suspicion of second degree manslaughter and that his attorney was making things worse by going to trial for first degree murder. Because Judge Lust was concerned about Mr. Sherrill's capacity to assist with his defense, with or without counsel, he ordered a mental evaluation.

¶14 On October 14, Mr. Sherrill appeared before Judge Michael Schwab, who, based on a psychiatric report, signed an order declaring Mr. Sherrill competent. Because of Mr.

---

[3] RP (Aug. 4, 2005) at 8.

Sherrill's continued complaints about Mr. Cotterell, Judge Schwab ordered a hearing on whether Mr. Cotterell would remain as Mr. Sherrill's counsel and on the availability of counsel or standby counsel if Mr. Sherrill waived counsel and proceeded pro se.

¶15 On October 19, the court entered an order allowing Mr. Cotterell to withdraw and setting a date to consider a hearing on October 21 as the status of the appointment of counsel for Mr. Sherrill. On October 31, Judge Lust heard from Daniel Fessler, who administers the public defender contracts. Mr. Fessler advised the court that he had been in contact with two potential defense attorneys—Mr. Sherrill refused one and the other declined to represent him. Mr. Fessler was attempting to contact a third attorney, but he doubted that attorney was available. Mr. Sherrill informed the court that he did not want the help of a state-funded attorney because he would hire private counsel if the State took him to trial. Mr. Sherrill wanted to be left alone. Mr. Sherrill stated that he was unlawfully before the court because he had not been served with notice of a trial. Judge Lust discouraged Mr. Sherrill from representing himself but held that Mr. Sherrill had voluntarily waived his right to counsel. The court asked the State to ensure that Mr. Sherrill had been handed the appropriate trial documentation. The court indicated it would talk to Mr. Sherrill again to see if he still wanted to represent himself. At that time, the case was set for trial that day, and the matter was placed on the trailing docket.

¶16 On November 2, Mr. Sherrill received the requested documentation after having appeared before Judge Lust and Judge Blaine Gibson. Judge Lust ruled that he would not appoint standby counsel, as was Mr. Sherrill's wish.

¶17 Mr. Sherrill appeared before Judge Ruth Reukauf on November 3 to determine whether he still wanted to proceed pro se. Mr. Sherrill informed the court that he had a private attorney he would bring in if necessary but, for the time being, he wished to be heard on a motion to dismiss based on the State's failure to provide the appropriate

documentation to bring him to trial. Mr. Sherrill asserted that the documentation that he had received to date was "illegal"[4] because it related only to second degree manslaughter and the signature on the order on arraignment for the first degree murder was not his signature. Judge Reukauf reviewed the seriousness of the charge with Mr. Sherrill and found that he voluntarily waived counsel.

¶18 On November 4, Mr. Sherrill received additional discovery before Judge Reukauf, but he continued to assert that he had not been properly served with documents calling him to trial. Another hearing was set to review his argument.

¶19 On November 7, Mr. Sherrill told Judge Reukauf that he did not intend to participate in the "illegal proceeding" at all.[5] Instead, he intended to sit through any further hearings with his "mouth shut."[6] Judge Reukauf asked Mr. Sherrill to identify the private attorney who was advising him, but under pain of contempt of court, he refused to identify the person. Judge Reukauf explained the difference between having counsel in a representative capacity and having standby counsel. She offered again to appoint standby counsel. Mr. Sherrill responded, "I am representing myself. For the eighteenth time, your Honor. What part of English do you not understand?"[7] Mr. Sherrill then demanded a change of venue, and the court conducted the CrR 3.5 hearing.

¶20 On November 8, Mr. Sherrill asked for a continuance to secure his witnesses. Mr. Sherrill informed the court that he would, in fact, participate in the proceedings because he had no choice, but that he intended to have an attorney in the next day or two. The court ordered Mr. Sherrill to return from recess with the name and addresses of his witnesses

[4] RP (Nov. 3, 2005) at 12.

[5] RP (Nov. 7, 2005) at 14.

[6] RP (Nov. 7, 2005) at 14.

[7] RP (Nov. 7, 2005) at 21.

and the name of the attorney he intended to hire. After lunch, Mr. Sherrill asked Judge Reukauf to appoint an attorney on his behalf because he had just learned that he could not afford the private attorney. Judge Reukauf indicated that she would sign an order reappointing counsel but warned Mr. Sherrill that she would not tolerate any more games. The court also ruled that the State properly called the matter to trial. On November 29, Judge Robert Hackett reappointed Mr. Cotterell.

¶21 On January 20, 2006, Mr. Cotterell informed Judge Reukauf that Mr. Sherrill was again objecting to his representation. Again, Mr. Sherrill insisted that if the State forced him to trial, he would call a private attorney, identified as Wes Hinsley of Wenatchee. Judge Reukauf discouraged Mr. Sherrill from representing himself because it was a very serious charge. Mr. Sherrill acknowledged that if he was found guilty he would likely receive a life sentence.

¶22 On January 27, Mr. Sherrill asked Judge Reukauf to appoint a different attorney. Judge Reukauf reminded Mr. Sherrill that he had previously told her he did not want anyone from the public defender's office. Mr. Sherrill answered, "That's not what I meant at all. I would like the court to assign me a new attorney."[8] When asked repeatedly to specifically state, in a nonconclusory manner, what Mr. Cotterell was doing or not doing that Mr. Sherrill was dissatisfied with, Mr. Sherrill stated that (1) Mr. Cotterell "is prosecuting me and not helping me"; (2) "[h]e has done nothing"; (3) "I would like to see him do the right thing and release me from this ugly attack"; and (4) "[a]ll Mr. Cotterell has done to me is threaten me. . . . Every time that Mr. Cotterell has spoke to me, . . . he tells me . . . that [the prosecutor] wants to lock me up for 240 or 360 [months] and to me that is a threat."[9] Mr. Cotterell told Judge Reukauf that Mr. Sherrill wanted to be charged with second degree manslaughter and released for time served, but that was

[8] RP (Jan. 27, 2006) at 17.

[9] RP (Jan. 27, 2006) at 18-21.

not a realistic outcome. The judge ruled that because Mr. Sherrill could not articulate a legitimate basis for his dissatisfaction, she would not appoint substitute counsel. Mr. Cotterell was left as standby counsel, over Mr. Sherrill's objection.

¶23 As the case wound through pretrial hearings, Mr. Sherrill again expressed his desire for an appointment of an attorney on January 30. Over Mr. Sherrill's objection, Judge Reukauf ordered Mr. Sherrill not to mention in front of the jury that he was representing himself under protest. The court stated that Mr. Sherrill had made a sufficient record.

¶24 After the jury was impaneled on February 1, Mr. Sherrill again expressed a desire for help with his case. He stated, "I don't know why the court keeps forcing Mr. Cotterell in my face when he won't do a thing for me."[10] Mr. Sherrill stated that Mr. Cotterell told him that he would not help him, but he needed help. Judge Reukauf told Mr. Sherrill that, as previously explained, Mr. Cotterell was assigned to act as standby counsel.

¶25 The judge asked Mr. Sherrill if he wanted to accept Mr. Cotterell in a representative capacity, to which Mr. Sherrill responded that he would do so if Mr. Cotterell would help him. Judge Reukauf questioned Mr. Cotterell as to how long it would take him to bring himself up to speed to assume Mr. Sherrill's representation if it were ordered. Mr. Cotterell answered the question but told the judge that he doubted that Mr. Sherrill would trust and accept his guidance. Mr. Cotterell stated, "I don't think I can represent him because he just doesn't want me to be his attorney. He wants me thrown out of the courtroom. He needs some help, but I don't think he really wants me to be his attorney."[11] Mr. Sherrill responded, "No, ma'am, I don't."[12] Satisfied with the record, the case proceeded to trial.

[10] RP (Feb. 1, 2006) at 25.

[11] RP (Feb. 1, 2006) at 30.

[12] RP (Feb. 1, 2006) at 30.

¶26 After the midafternoon recess on the first day of trial, Mr. Cotterell stated that he wanted the record to reflect that Mr. Sherrill was "quite emotional and sobbing and he's quite distraught right now."[13] Mr. Cotterell asked the court to take notice of Mr. Sherrill's state and make sure that he was fit to continue. The judge told Mr. Sherrill to let her know when he needed a break.

¶27 During trial, Mr. Sherrill cross-examined two witnesses with one question each. He decided not to call the witnesses he planned because he did not feel up to the task of examining his family members. Mr. Sherrill stated that he asked Mr. Cotterell to examine the witnesses but he would not. The judge explained that Mr. Cotterell was appearing only as standby counsel. Mr. Sherrill did not present an opening or closing argument, and he did not put on a case.

¶28 The jury convicted Mr. Sherrill as charged. This appeal follows.

## DISCUSSION

¶29 I. Mr. Sherrill contends the trial court abused its discretion by denying his request for the reappointment of counsel based on his dissatisfaction with appointed counsel. Decisions relating to reappointment based on attorney-client differences are reviewed for abuse of discretion. *State v. Cross*, 156 Wn.2d 580, 607, 132 P.3d 80, *cert. denied*, 549 U.S. 1022 (2006); *State v. Varga*, 151 Wn.2d 179, 200, 86 P.3d 139 (2004). The right to retain counsel of choice is recognized by the Sixth Amendment. *In re Pers. Restraint of Stenson*, 142 Wn.2d 710, 725-26, 16 P.3d 1 (2001). But a defendant does not have an absolute, Sixth Amendment right to choose any particular advocate. *Id.*

¶30 "To justify appointment of new counsel, a defendant 'must show good cause to warrant substitution of counsel, such as a conflict of interest, an irreconcilable

---

[13] RP (Feb. 1, 2006) at 131.

conflict, or a complete breakdown in communication between the attorney and the defendant.' " *Varga*, 151 Wn.2d at 200 (quoting *State v. Stenson*, 132 Wn.2d 668, 734, 940 P.2d 1239 (1997)). Mr. Sherrill's loss of confidence or trust in Mr. Cotterell was not a sufficient reason to appoint new counsel. *See Stenson*, 132 Wn.2d at 734.

¶31 Here, Judge Reukauf examined Mr. Sherrill extensively on his reasons for wanting a new attorney. Mr. Sherrill could not identify any specific reason.

¶32 Mr. Sherrill seems to argue that his continuous pleas for counsel were ignored and that the trial court gave him the choice of representing himself or remaining with Mr. Cotterell. Throughout the proceedings, Mr. Sherrill stated inconsistently that he did not want any attorney, he would hire private counsel, he was being advised by counsel whom he refused to identify, he could not afford an attorney, he did not want any state-paid attorney, he would accept Mr. Cotterell, he would accept any attorney except Mr. Cotterell, he would accept a public defender, he would not accept standby counsel, he would not use Mr. Cotterell as standby counsel, and he would accept Mr. Cotterell only if he would help. Mr. Sherrill was heard on this issue numerous times from August 2005 through his trial in February 2006. The trial judge finally determined that Mr. Sherrill's antics were nothing more than game-playing.

¶33 The trial court did not abuse its discretion by denying Mr. Sherrill's request for new counsel.

¶34 II. Mr. Sherrill argues on appeal that there is insufficient evidence of premeditation. He argued at trial that the evidence was insufficient to submit premeditation to the jury.

¶35 The jury was instructed that

[t]o convict the defendant of the crime of First Degree Murder, each of the following elements of the crime must be proved beyond a reasonable doubt:

(1) That on or about July 6, 2004, the defendant struck Teressa Lynn Hilton[;]

(2) That the defendant acted with intent to cause the death of Teressa Lynn Hilton;

(3) That the intent to cause the death was premeditated;

(4) That Teressa Lynn Hilton died as a result of defendant's act; and

(5) That the acts occurred in the State of Washington.

Clerk's Papers (CP) at 41 (Instruction 7).

¶36 The jury was also instructed on premeditation:

Premeditated means thought over beforehand. When a person, after any deliberation, forms an intent to take human life, the killing may follow immediately after the formation of the settled purpose and it will still be premeditated. Premeditation must involve more than a moment in point of time. The law requires some time, however long or short, in which a design to kill is deliberately formed.

CP at 40 (Instruction 6).

¶37 The test for reviewing a defendant's challenge to the sufficiency of evidence in a criminal case is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt." *State v. Gentry*, 125 Wn.2d 570, 596-97, 888 P.2d 1105 (1995). All reasonable inferences from the evidence are drawn in favor of the State. *Id.* at 597.

¶38 "Premeditation" is "the deliberate formation of and reflection upon the intent to take a human life." *State v. Hoffman*, 116 Wn.2d 51, 82, 804 P.2d 577 (1991). Premeditation may be shown by circumstantial evidence where the jury's inferences are reasonable and substantial evidence supports the jury's verdict. *State v. Finch*, 137 Wn.2d 792, 831, 975 P.2d 967 (1999). Where the sufficiency of the evidence has been challenged with respect to the element of premeditation, Washington cases hold that a wide range of factors can support an inference of premeditation. *Id.* Motive, procurement of a weapon, stealth, and method of killing are "particularly relevant" factors in establishing

premeditation. *State v. Pirtle*, 127 Wn.2d 628, 644, 904 P.2d 245 (1995).

¶39 Here, no evidence of motive, procurement of a weapon, or stealth was presented. Accordingly, Mr. Sherrill argues that the evidence was insufficient to establish premeditation. We disagree.

¶40 In *State v. Allen*, 159 Wn.2d 1, 8, 147 P.3d 581 (2006), the defendant also asserted insufficient evidence of premeditation, arguing that "he never expressed a preconceived intent to kill, he did not take weapons to his mother's home, and he himself was shocked at how their heated argument escalated into violence." The court disagreed, noting that "a physical struggle over 'an appreciable period of time' prior to strangulation is sufficient evidence of premeditation." *Id.* In *Allen*, the altercation with his mother went from the kitchen to the bedroom and involved pushing and wrestling before escalating to strangulation. *Id.*

¶41 Here, the high and low blood spatter evidence showed that Ms. Hilton was attacked while she was on the ground and while standing up. Blood on the ground and clumps of traumatically-removed hair also showed that the attack occurred inside and outside the motor home. Witness testimony suggested that the fighting began in the early evening and continued for several hours.

¶42 Blood spatter was found in the kitchen, bathroom, living room, and outside on the step and wheels of the trailer. The appliances and carpet had blood on them. Blood and imbedded hair were found on a VCR and television receiver as well as on a step outside the door.

¶43 In cases of premeditated intent to cause death, the cause of death is a significant factor. Here, there were at least 42 separate blunt impact injuries on Ms. Hilton's body. She sustained injuries to her head and abdomen, and also had fractured ribs and a lacerated liver. Forensic pathologist Dr. Gina Fino answered "yes" when asked if the head injury

was "in and of itself a life threatening situation."[14] The rib fractures resulted in the collection of a "moderate" amount of internal bleeding in the chest cavity.[15] Dr. Fino again answered "yes" when asked if the rib fractures and bleeding were "something that in and of itself would be life threatening to a person."[16] The laceration to the liver was, in and of itself, potentially a life-threatening injury.

¶44 Dr. Fino could not determine how long Ms. Hilton was conscious after she sustained the injuries and before she died. Dr. Fino estimated it could have been from 15 minutes to one hour or several hours. Dr. Fino stated that due to the injuries to Ms. Hilton's hands, Ms. Hilton was conscious for some of the attack. Dr. Fino concluded that the cause of death was multiple internal injuries due to blunt impact to the head, chest, and abdomen.

¶45 Mr. Sherrill argues that *State v. Bingham*, 105 Wn.2d 820, 719 P.2d 109 (1986) is applicable to the facts here. In *Bingham*, the court held that manual strangulation alone is insufficient evidence to support a finding of premeditation where no evidence was presented of deliberation or reflection before or during the strangulation. *Id.* at 827-28. But manual strangulation involves one continuous act. Here, there were multiple attacks over several hours. While multiple wounds and sustained violence, standing alone, are insufficient to support an inference of premeditation, other evidence, combined with multiple wounds and sustained violence, does support an inference of deliberation and reflection. Evidence including prior threats or quarrels and defensive wounds on the victim will support an inference of premeditation. *See State v. Millante*, 80 Wn. App. 237, 248, 908 P.2d 374 (1995). Here, a lengthy history of violence and fighting existed. And there were defensive wounds on Ms. Hilton.

---

[14] RP (Feb. 2, 2006) at 229.

[15] RP (Feb. 2, 2006) at 233.

[16] RP (Feb. 2, 2006) at 233.

¶46 In 2003, Ms. Hilton was taken to an emergency room for treatment after Mr. Sherrill beat her unconscious. In 2004, Mr. Sherrill was arrested after a passerby saw Mr. Sherrill attempting to restrain Ms. Hilton in his car as she attempted to get out. Ms. Darden testified that Ms. Hilton often called her to pick her up when she and Mr. Sherrill fought. Ms. Darden noted that Ms. Hilton had bruises on her body and face, and bald spots on her head where Mr. Sherrill ripped her hair out. Two days before the attack causing Ms. Hilton's death, Ms. Darden saw scratches and bruises on Ms. Hilton's face. On one occasion, Ms. Hilton's nose was nearly torn off.

¶47 Here, Ms. Hilton was attacked as she was on the ground, standing up, inside and outside the house, and over a period of several hours. The history of violence, the defensive cuts on Ms. Hilton's hands, and the 42 blunt impact injuries are evidence sufficient for a jury to infer deliberation and reflection before and during the beating. While Mr. Sherrill correctly asserts that, standing alone, multiple wounds and sustained violence cannot support an inference of premeditation, the infliction of multiple blows is strong evidence of premeditation. *See State v. Ortiz*, 119 Wn.2d 294, 312, 831 P.2d 1060 (1992); *Cross*, 156 Wn.2d at 627.

¶48 We conclude that a rational juror could find that the evidence, taken together, is sufficient to find premeditation beyond a reasonable doubt. Accordingly, we affirm.

STEPHENS, J. PRO TEM., concurs.

¶49 SCHULTHEIS, C.J. (dissenting) — To find premeditation, there must be at least circumstantial evidence "where the inferences drawn by the jury are reasonable and the evidence supporting the jury's verdict is substantial." *State v. Bingham*, 105 Wn.2d 820, 824, 719 P.2d 109 (1986) (citing *State v. Luoma*, 88 Wn.2d 28, 558 P.2d 756 (1977)). Because of the absence of evidence of premeditation in this record, I would reverse.

¶50 The cases relied upon by the majority share two characteristics: the defendant's use of some instrument in accomplishing the act of murder and specific fatal injuries. Neither characteristic is present here.

¶51 For instance, in *State v. Allen*, 159 Wn.2d 1, 5-6, 8-9, 147 P.3d 581 (2006), the defendant first wrestled with and then strangled the victim, using a telephone cord until it broke, and then he got a rifle from a cabinet that he used to strike the fatal blows. This shows sufficient evidence of premeditation—a deliberate formation of and reflection upon the intent to take the victim's life. When there is evidence of a decision to use a weapon, particularly in escalation of a hand-to-hand struggle, the jury can infer that the user identified some purpose and consequence of the weapon's use, which shows deliberation. But there is no such evidence in the case before this court. Kenith Wayne Sherrill could have picked up any number of objects in the cluttered motor home to use as a weapon. But he used nothing. "[S]tanding alone, multiple wounds and sustained violence cannot support an inference of premeditation." *State v. Ortiz*, 119 Wn.2d 294, 312, 831 P.2d 1060 (1992).

¶52 The absence of a weapon is also particularly significant in this case when considering the slight stature of both Mr. Sherrill and Teressa Hilton. I can envision cases of premeditation where no weapon is used but a defendant's size outmatches the victim and there is sustained violence with specific, devastating injuries. But that is not the case here.

¶53 On direct examination of forensic pathologist Dr. Gina Fino, the State asked whether internal bleeding of the brain is "in and of itself a life threatening situation." Report of Proceedings (RP) (Feb. 2, 2006) at 229. Her response was open ended: "Depending upon which parts of the brain are involved, yes." *Id.* When addressing Ms. Hilton's specific injury, Dr. Fino described it as something one would see in "low speed or low impact vehicle type crashes." *Id.* In response to questioning as to whether the amount of blood that had collected in Ms. Hilton's chest was significant, Dr.

Fino stated that it was "a moderate loss of blood." *Id.* at 233. Dr. Fino was asked whether the internal bleeding in the chest cavity was "something that in and of itself would be life threatening to a person." *Id.* Dr. Fino responded that it was because with "blood . . . irritating the chest cavity, it's going to cause a decreased ability to breathe." *Id.* The State questioned Dr. Fino regarding whether the laceration on the edge of the liver is "in and of itself potentially a life threatening injury." *Id.* at 235. Dr. Fino responded that it was, mainly because such an injury "causes bleeding and loss of blood, [which] decreases the amount of nourishment that gets to the tissues." *Id.* at 236.

¶54 It is also noted that Ms. Hilton had a dangerously high blood/alcohol level of 0.32 grams per 100 milliliters, which can be judicially noted under ER 201(b) to be within the fatal range. *E.g.*, 4 Roscoe N. Gray & Louise J. Gordy, Attorneys' Textbook of Medicine ¶ 134A.82 (3d ed. 1988); *see also State v. Smissaert*, 41 Wn. App. 813, 815, 706 P.2d 647 (1985) (holding that the effects of alcohol are commonly known).

¶55 In *State v. Harris*, 62 Wn.2d 858, 868, 385 P.2d 18 (1963), the victim "had been struck on the head several times with a blunt instrument with such force that in one place her skull had been fractured into her brain." The victim was also strangled with a garrote fashioned from a vacuum cleaner cord and handle. *Id.* at 860. While strangulation was the immediate cause of death, the victim would have died as a result of the skull fracture. *Id.* at 860-61. In this case, none of Ms. Hilton's injuries were, on their own, specific or devastating.

¶56 The absence of an identifiable coup de grace separates the injuries in this case from those that might be found in a premeditated beating death. None of Ms. Hilton's injuries, alone or together, can be viewed as being struck with such brutal force to show that they were borne of " 'deliberate formation of and reflection upon' " the intent to take Ms. Hilton's life. *State v. Gentry*, 125 Wn.2d 570, 597,

888 P.2d 1105 (1995) (quoting *State v. Robtoy*, 98 Wn.2d 30, 43, 653 P.2d 284 (1982)).

¶57 As noted in *Harris*, " '[P]roof of the fact of killing, alone, does not raise a presumption of premeditation or deliberation, but premeditation or deliberation may be inferred from the circumstances of the killing.' " *Harris*, 62 Wn.2d at 868 (quoting *State v. Gaines*, 144 Wash. 446, 467, 258 P. 508 (1927)). The challenge in the case before us is to discern premeditation from the circumstances of the fatal beating apart from the death itself. There is nothing to be found.

¶58 In *Bingham*, the evidence showed three to five minutes were required to manually strangle the victim. *Bingham*, 105 Wn.2d at 824. The Supreme Court found the evidence of the strangulation alone insufficient. *Id.* at 827. The court held:

> [T]o allow a finding of premeditation only because the act takes an appreciable amount of time obliterates the distinction between first and second degree murder. Having the *opportunity* to deliberate is not evidence the defendant *did* deliberate, which is necessary for a finding of premeditation.

*Id.* at 826 (emphasis added).

¶59 Here, Mr. Sherrill had an opportunity to deliberate but the evidence does not establish facts from which an inference of deliberation can be found. The majority does not point to any evidence of premeditation but determines the jury could have concluded that the evidence existed anyway. *Bingham* requires us to ask, *did the premeditation occur?* not *could the premeditation have occurred?*

¶60 Because Mr. Sherrill did not use counsel and participated precious little in his own defense, it is easy to see how the jury could be swayed by the one-sided presentation. But the State limited its closing argument to the opportunity for premeditation and the sustained violence:

> Ladies and gentlemen, when you consider this and all the evidence, there is no question but that the defendant was *able*

*to engage* in the cognitive process to build an intent to kill, which clearly took more than a moment in time. . . .

. . . .

What do we know about the situation as it was? Was there an accident? Not 42 times. Was there any showing of anything other than traumatic force that was intentionally and volitionally applied after having ample time to stop? But not stopping, hitting and continuing to hit and killing, *killing in ways where there are three major traumatic injuries.*

RP (Feb. 7, 2006) at 507-09 (emphasis added).

¶61 The jury was instructed that in order for premeditation to be found, the law requires evidence of deliberation to form an intent to take human life and some time, after the formation of the settled purpose, in which a design to kill is deliberately formed. The evidence here shows three traumatic injuries, none of which were individually fatal, that occurred over some time and took place in a number of rooms while the victim was both standing up and lying on the ground. This evidence does not show the formation of a design to kill by the infliction of multiple blows to various parts of a victim's body. It does not seem logical to plot the death of another in this manner.

¶62 While I am struck and sickened by the evidence of violence in this case, viewing that evidence in the light most favorable to the State, it is insufficient from which a reasonable jury could infer that Mr. Sherrill formed the intent to beat Ms. Hilton to death with his bare hands. Because I find insufficient evidence to establish premeditation, I would reverse.

Review denied at 165 Wn.2d 1022 (2009).