# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 57958-8-II |
| Respondent, | |
| v. | |
| MICHAEL JOHN BOYD, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, J.—Jason Hlousek walked with a cane as a result of a workplace injury. Michael Boyd got into a fight with Hlousek because Boyd thought Hlousek was trying to steal from him. Boyd stabbed Hlousek 19 times and Hlousek died shortly thereafter. Boyd later told a police officer that he would pay the officer $50,000 to stab Hlousek's wife, Mary.[1]

The State charged Boyd with first degree murder with aggravating factors, including victim vulnerability.[2] The State also charged Boyd with solicitation to commit first degree assault. A jury convicted Boyd on all counts.

Boyd appeals, arguing there was insufficient evidence to sustain his convictions because the State failed to prove premeditation, a lack of self-defense, the aggravating factor of victim vulnerability, and solicitation to commit first degree assault.

We affirm.

---

[1] Because Mary Hlousek shares a last name with Jason Hlousek, we will refer to her as Mary for clarity.

[2] The jury also found the aggravating factor of recent release from incarceration; however, Boyd does not challenge that finding on appeal.

FACTS

A.    Background

At the time of the incident that led to Boyd's conviction, Boyd had been friends with Mary for over 30 years and with Hlousek for 18 years. The Hlouseks lived with and raised Boyd's biological son, James. Boyd received a large sum of money from a settlement stemming from abuse he suffered as a child while under state care, and he relied on the Hlouseks to manage his finances while he was in prison on an earlier, unrelated conviction. In 2021, Boyd was released from prison and promptly moved in with the Hlouseks and James.

On the night before the incident, Mary placed her bag, which contained a folding knife, on the kitchen counter in her home. Early the next morning, Mary awoke to find that her folding knife was no longer in her bag on the counter. Hlousek was still in bed, and James had been away from home visiting his grandmother. However, Mary noticed that Boyd was already awake. Boyd cut a hole in one of the straps of the overalls he was wearing, but Mary did not see what he used to cut the hole.

Mary said goodbye to Boyd before she left the house to retrieve James from Vancouver, Washington, where he had been visiting with his grandmother. While Mary was gone, Boyd and Hlousek got into a fight in the driveway of the home, and Boyd stabbed Hlousek 19 times.

B.    Boyd's Arrest

Officers were called to the scene by concerned eyewitnesses and handcuffed Boyd in the driveway. After telling officers his name, Boyd said, "'He stole a lot of money from me. He embezzled a lot of money from me.'" 1 Verbatim Rep. of Proc. (VRP) at 308. Longview Police Department Officer Ken Hardy arrived at the scene and saw that Boyd was in handcuffs. When

Officer Hardy asked Boyd what happened, Boyd again said that "[Hlousek] was embezzling money" from him. 1 VRP at 433.

Later that afternoon, Boyd was taken to St. John's Medical Center. Detective Matthew Hartley was called to the hospital to supervise Boyd until Boyd could be medically cleared for booking at the jail. While at the hospital, Boyd told Detective Hartley, "I'll pay you $50,000 to stab that bitch Mary in the face." 1 VRP at 353.

Upon Boyd's clearance from the hospital, he was booked at the Cowlitz County Jail. Later that night, Boyd called Mary from the jail and told her she "should have known, it would have happened eventually anyway," and that he wanted her to put $1,000 on his books at the jail. 1 VRP at 185. Detective Dawn Taylor overheard another phone call Boyd made from the jail where Boyd was asked, "What happened[?]" In response, Boyd said, "[Hlousek] was trying to steal my money." VRP at 473.

The State charged Boyd with first degree murder and gave notice it would be seeking an exceptional sentence based on aggravating factors, including victim vulnerability. The State also charged Boyd with solicitation to commit first degree assault, in addition to some other charges not relevant to this appeal.

C.      Evidence Presented at Trial

1.      Testimony about the fatal stabbing

Brittany Barret, a teacher at an elementary school located directly across the street from the Hlousek's home, testified that on the afternoon of the stabbing, she heard yelling outside her classroom. Barret reported hearing something along the lines of, "I don't have your money," and "screaming about money." 1 VRP at 205. Barret approached her window to get a better view and saw a large, shirtless man in overalls hitting another man. Barret began recording the incident on

her cellphone. Barret testified that the man in overalls was on top of the other man, hitting him in a "very fast and furious" way. 1 VRP at 208. Barret noticed that the man being struck kicked his legs up and "flopped" in what appeared to be a reflexive action or an attempt to "move his body out of the way." *Id.* When the man in the overalls stopped striking the man on the ground, Barrett watched him grab a nearby garbage can and place it in front of the body before disappearing through a gate into the backyard of the residence. When Barret noticed the man on the ground was bleeding "profusely" from his head and neck and was not moving at all, she called 911. 1 VRP at 214.

Later that day, Barrett watched the video she took on her cellphone, used the zoom function, and noted it was "very clear" the man hitting the other man "ha[d] a knife in his hand." 1 VRP at 211. Barret's video and the elementary school's surveillance footage were played for the jury. Consistent with witness testimony, the footage showed Hlousek backing away before Boyd kneeled atop Hlousek and stabbed him. Boyd himself testified that the footage depicted Boyd standing up, as if he was catching his breath, before crouching over Hlousek once again to continue stabbing him.

Another witness, Dennis Fedoruk, lived near Hlousek's home. Fedoruk testified that on the afternoon of the stabbing, he heard yelling outside. Fedoruk looked out his bedroom window and saw a man in overalls, later identified as Boyd, punching Hlousek, who then fell to the ground. Once Hlousek was on the ground, Fedoruk saw Boyd sit on Hlousek and continue punching him. As Boyd's hand was raised, Fedoruk caught the reflection of the sun on a knife blade and realized that Boyd was stabbing Hlousek, not punching him. Throughout the incident, Fedoruk never saw Hlousek on top of Boyd, nor did Fedoruk see Hlousek punching or hitting Boyd.

4

Melanie Kiggins was driving down the street on the afternoon of the stabbing when she saw two men fighting in a driveway. As Kiggins got closer to the fight, she saw that one man, wearing overalls, had a knife and was stabbing the other man who was wearing a tank top, with that knife. The man in the overalls, later identified as Boyd, was "coming at" the man in the tank top, later identified as Hlousek, who was "backing up." 1 VRP at 264. Boyd hung onto Hlousek and stabbed him while they were both standing up. Eventually, Boyd "tackled" Hlousek to the ground, got on his knees, and continued stabbing Hlousek "over and over again." 1 VRP at 266. Finally, Kiggins saw Boyd put the knife in his pocket and place garbage cans between Hlousek and the street. Consistent with Fedoruk's testimony, Kiggins testified that she never saw Hlousek punch, kick, or stab Boyd.

Kayla McCarthy also drove down the street on the afternoon of the stabbing and saw a fight between two people in a driveway. McCarthy testified that one person was on top of another person, who was lying on their back. Because the fight concerned McCarthy, she drove by the scene again and noticed that the person lying on their back, later identified as Hlousek, was completely unconscious and covered in blood. McCarthy then rushed to a police officer, Terry Reece, who was sitting nearby in his patrol car, and told him what she saw.

Officer Reece drove to the location of the incident, where he saw a person lying in a pool of blood in a driveway, and a man wearing overalls, standing up. Reece identified himself as law enforcement and commanded the man in the overalls to "stop." 1 VRP at 302. The man turned around and walked through the side gate into the backyard. Reece commanded him to come out from the backyard with his hands up. Eventually, the man complied, and Reece placed him in handcuffs before taking him to the Longview Police Department station. The man identified

himself as "Michael Boyd," and upon being read his rights, told officers, "'He stole a lot of money from me. He embezzled a lot of money from me.'" 1 VRP at 308.

After the stabbing, Dr. Clifford Nelson a forensic pathologist, performed the autopsy on Hlousek. Dr. Nelson testified that Hlousek suffered 19 stab and/or cutting wounds to his head, neck, chest, and arms. Of Hlousek's 19 wounds, 2 would have been fatal on their own. In one wound above Hlousek's eyebrow, the broken off tip of the knife blade was lodged in his skull. The Washington State Patrol Crime Laboratory Division's testing showed that the broken blade in Hlousek's skull came from the bloody knife collected from the scene.

### 2.    Testimony about Boyd's self-defense claim

At trial, Boyd asserted that he acted in self-defense when he stabbed Hlousek. Boyd testified that Hlousek had the knife and began the fight by punching him. The two then struggled over the knife, but Boyd was able to take the knife from Hlousek and stabbed him because "it was either him or me." 2 VRP at 539. Boyd testified that he did not remember all the details of the incident.

### 3.    Testimony about Hlousek's particular vulnerability

At trial, James testified that Hlousek consistently walked with a cane and sometimes used a walker. Mary testified that Hlousek suffered from a back injury that was "debilitating." 1 VRP at 170. The back injury had put Hlousek out of work for six months and caused him "[e]xcruciating pain" and "weakness." *Id.* Hlousek was unable to complete basic tasks on his own, including walking without a cane, dressing himself, bathing himself, and putting on his shoes. Hlousek only drove if absolutely necessary because driving caused him pain. Hlousek also had carpal tunnel syndrome, which caused "weakness" in his hands and made him prone to dropping things. 1 VRP at 171.

### 4.     Testimony about solicitation of assault in the first degree

Detective Hartley testified that while he was supervising Boyd in the hospital after the arrest, Boyd woke up from a nap and said, "I'll pay you $50,000 to stab that bitch Mary in the face," before falling back asleep. 1 VRP at 353. Boyd testified that he did not recall asking Detective Hartley to stab Mary in the face for $50,000.

### D.     Jury Instructions and Verdict

The jury convicted Boyd of first degree murder with the aggravating factor of victim vulnerability and solicitation to commit first degree assault. The jurors were instructed that "[a] victim is 'particularly vulnerable' if [they are] more vulnerable to the commission of the crime than the typical victim of murder in the first degree. The victim's vulnerability must also be a substantial factor in the commission of the crime." Clerk's Papers (CP) at 235. When asked, as part of the special verdict form, "[d]id the defendant know, or should the defendant have known, that the victim was particularly vulnerable or incapable of resistance?" the jury answered, "Yes." CP at 239. Boyd did not object to the instruction or the special verdict form language.

### ANALYSIS

When a criminal defendant challenges the sufficiency of evidence, the standard of review is "'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (emphasis omitted) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979)). Moreover, insufficient evidence claims "admit[] the truth of the State's evidence and all inferences that reasonably can

be drawn therefrom." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "'Circumstantial evidence and direct evidence are equally reliable' in determining the sufficiency of the evidence." *State v. Kintz*, 169 Wn.2d 537, 551, 238 P.3d 470 (2010) (quoting *State v. Thomas*, 150 Wn.2d 821, 874, 83 P.3d 970 (2004)). But "inferences based on circumstantial evidence must be reasonable and cannot be based on speculation." *State v. Vasquez*, 178 Wn.2d 1, 16, 309, P.3d 318 (2013).

## I. FIRST DEGREE HOMICIDE

A.      Premeditation

Premeditation is an essential element of first degree murder. *State v. Hoffman*, 116 Wn.2d 51, 82, 804 P.2d 577 (1991). Under Washington law, the premeditation required to support a first degree murder conviction must involve "more than a moment in point of time." RCW 9A.32.020(1). Specifically, the State must show "the deliberate formation of and reflection upon the intent to take a human life," which "involves the mental process of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short." *Hoffman*, 116 Wn.2d at 82-83. The State can prove premeditation through circumstantial evidence "where the inferences drawn by the jury are reasonable and the evidence supporting the jury's finding is substantial." *State v. Pirtle*, 127 Wn.2d 628, 643, 904 P.2d 245 (1995). Four characteristics of a crime are "particularly relevant to establish premeditation: motive, procurement of a weapon, stealth, and the method of killing." *Id.* at 644. All four characteristics need not support premeditation for a jury to find sufficient evidence of premeditation. *See State v. Sherrill*, 145 Wn. App. 473, 485, 186 P.3d 1157 (2008).

Boyd argues that the State did not provide sufficient evidence to prove premeditation beyond a reasonable doubt. Because there was evidence that Boyd and Hlousek had a long-

standing friendship, witnesses did not see how the fight began, and there was little evidence that Boyd attempted to conceal Hlousek's body after the stabbing, Boyd contends that the State failed to establish a viable motive, method of killing, or stealth as evidence of premeditation. We disagree.

　　　　1.　　　Motive

A viable motive is one characteristic of a crime that can serve as evidence from which a jury can reasonably infer premeditation. *See State v. Bingham*, 105 Wn.2d 820, 824, 719 P.2d 109 (1986). Strained relationships can suggest a viable motive and support a finding of deliberation and premeditation. *See State v. Neslund,* 50 Wn. App. 531, 559, 749 P.2d 725 (1988) (holding that defendant's shooting of husband involved premeditation in part because evidence indicated that defendant and husband had a "stormy" relationship, which suggested a possible motive).

Boyd relies on *Neslund* to argue that because there is little evidence of antagonism between Boyd and Hlousek throughout their decades-long friendship, the State failed to provide sufficient evidence establishing a viable motive. Boyd's argument distorts *Neslund*'s holding, which provided that a strained relationship can indicate a viable motive, not that a strained relationship is the only plausible indicator of a viable motive. *Neslund,* 50 Wn. App. at 559-60 (holding that defendant's possible motive was also established through evidence that the defendant transferred the couple's joint assets into bank accounts under her name and that the defendant's husband told her to "'put the money back or else'" shortly before the killing). Premeditation can be established through an array of circumstantial evidence so long as the "inferences drawn by the jury are reasonable and the evidence supporting the jury's findings is substantial." *State v. Luoma*, 88 Wn.2d 28, 33, 558 P.2d 756 (1977). A strained relationship is one possible circumstance among many reasonable indicators of motive.

Here, viewed in the light most favorable to the State, there was substantial evidence for the jury to reasonably infer a viable motive. A witness testified that in the fight immediately leading up to the stabbing, someone yelled something to the effect of, "'I don't have your money,'" Boyd twice told officers that he believed Hlousek had embezzled a lot of money from him, and Boyd told his mother "[Hlousek] was trying to steal my money" when she asked, "What happened[?]" after the stabbing. VRP at 205, 473.

2. Procurement of weapon and method of killing

Evidence of procuring a weapon and of certain methods of killing can indicate premeditation. In *State v. Ollens*, 107 Wn.2d 848, 733 P.2d 984 (1987), the court concluded there was sufficient evidence of premeditation to send the issue to a jury. The court relied on the fact that the defendant stabbed the victim "numerous times," and "thereafter slashed the victim's throat." *Id.* at 853. In *Ollens*, the court distinguished the defendant's method of killing from something like manual strangulation, which "involves one continuous act," and does not involve the procurement of a weapon. *Id.* In other words, manual strangulation inherently tends to require less planning and deliberation than does acquiring a weapon. *See id.* Moreover, the subsequent throat slashing in *Ollens* served as an indication that the defendant premeditated on his "already formed intent to kill." *Id.* Further, a pause in an attack has been held to support a finding of premeditation. *See State v. Sargent*, 40 Wn. App. 340, 353, 698 P.2d 598, (1985) (holding there was sufficient evidence to support a finding of premeditation where the victim was struck by two separate blows to the head with "some interval passing between them"); *see also State v. Gibson*, 47 Wn. App. 309, 312, 734 P.2d 32, (1987) (holding that a jury was permitted to find the element of premeditation beyond a reasonable doubt based on "a sufficient lapse of time" between the beating and strangulation of victim).

Boyd argues that *Ollens* is distinguishable from the instant case because the evidence here "indicated both men fought in front of each other pushing and punching in some form of mutual combat," whereas *Ollens* involved an attack from behind the victim. Appellant's Opening Br. at 26; *see also Ollens*, 107 Wn.2d at 853. Though Boyd is correct that there is no evidence indicating Boyd attacked Hlousek from behind, Boyd again mistakes a contributing factor to premeditation for a dispositive one. The element of surprise in *Ollens* contributed to premeditation but was not, on its own, determinative.

Here, looking at the totality of the circumstances, evidence involving the "procurement of weapon" and "method of killing," weighed together, support premeditation. *Ollens*, 107 Wn.2d at 853 (holding that a reasonable trier of fact could find premeditation beyond a reasonable doubt based on evidence that defendant procured a knife, stabbed the victim "numerous times," slashed the victim's throat, and struck the victim from behind). Moreover, Boyd's assertion that the men fought in mutual combat directly conflicts with witness testimony and video evidence showing Hlousek "backpedaling" before Boyd threw him onto his back, kneeled over him, and stabbed him repeatedly. VRP at 552-53.

Contrary to Boyd's argument, the facts of *Ollens* parallel the facts here. Like the defendant in *Ollens*, Boyd procured a knife to kill Hlousek and stabbed him numerous times, even pausing to break between rounds of stabbing, which afforded Boyd enough time to consider the consequences of his actions. Boyd's pause in stabbing is similar to the pauses during the fatal attacks in *Sargent* and *Gibson*, which supported findings of premeditation. *See Sargent*, 40 Wn. App. at 353; *see also Gibson*, 47 Wn. App. at 312. Additionally, Boyd ended the stabbing attack after he twisted the knife in Hlousek's head with such force that the knife's tip lodged in Hlousek's skull. Boyd's knife twist could be likened to the defendant's "subsequent slashing" in *Ollens*,

which the court there saw as an indication of the defendant's premeditated intent to kill. 107 Wn.2d at 853.

Taken in the light most favorable to the State, there was sufficient evidence to infer that Boyd procured the knife hours before the stabbing, further indicating premeditation. Mary left a knife out the night before the stabbing. On the morning of the stabbing, Mary noticed that her knife was no longer where she left it. When Mary saw that her knife was gone, she noted that Hlousek was still in bed, but that Boyd was awake, using an object to cut off the strap of his overalls. At trial, Mary testified that the knife recovered from the crime scene was the same knife she left out the night before the stabbing. From this, the jury could reasonably infer that Boyd procured Mary's knife hours before he used it to stab Hlousek.

3.    Stealth

A defendant's stealth or lack thereof is another characteristic that can be weighed in determining premeditation. *See State v. Pirtle*, 127 Wn.2d 628, 644, 904 P.2d 245 (1995). Boyd argues that the State failed to provide sufficient evidence of stealth, asserting that moving the garbage can after the stabbing was not an attempt to conceal the crime scene because Hlousek was still in plain view of the street. We agree. However, not all of the four factors need to indicate premeditation for a jury to reasonably find premeditation beyond a reasonable doubt. *See Sherrill*, 145 Wn. App. at 485 (holding that absent evidence of motive, procurement of a weapon, or stealth, the evidence was still sufficient for a rational juror to find premeditation beyond a reasonable doubt).

In sum, viewing the evidence in the light most favorable to the State, a reasonable trier of fact could have found that Boyd acted with premeditation. Witnesses overheard Boyd and Hlousek fighting over money. Boyd told police that Hlousek was embezzling money from him, and Mary

noticed her knife was missing hours before the stabbing. Notably, Boyd paused between rounds of persistent stabbing. Based on this evidence, a rational juror could infer a viable motive, the procurement of a weapon, and the method of killing served as evidence of Boyd's premeditation.

B.        Justifiable Homicide

Boyd argues that the State failed to prove beyond a reasonable doubt that Boyd did not act out of self-defense, a justifiable homicide. We disagree.

The State has the burden of proving beyond a reasonable doubt that the homicide was not in self-defense and therefore justifiable under RCW 9A.16.050. The requisite elements of self-defense provide that, first, at the time of the event, "the defendant must subjectively believe that [they are] . . . in imminent danger of great personal injury and . . . responding with only that degree of force necessary to repel the danger." *State v. Bergeson*, 64 Wn. App. 366, 370, 824 P.2d 515 (1992). Second, the defendant's subjective beliefs "must be such that a reasonable person considering only the circumstances known to the defendant at the time would also have entertained them." *Id.* Further, to justify deadly force in self-defense, a person must provide evidence establishing that they had a reasonable apprehension "of great bodily harm and imminent danger" and that the killing occurred in "circumstances amounting to defense of life." *State v. Read*, 147 Wn.2d 238, 242, 53 P.3d 26 (2002) (holding that even if defendant reasonably believed he was going to get hurt, he failed to justify his use of deadly force absent evidence that he reasonably believed he was in imminent danger of death or great bodily harm).

There was sufficient evidence for a reasonable juror to find that Boyd did not face imminent danger or great bodily harm and killing Hlousek was not necessary to repel danger. Based on witness testimony and video evidence demonstrating that Hlousek backed away before Boyd threw him on the ground and began stabbing him repeatedly—and Hlousek did not fight back—a rational

juror could find that Boyd did not face imminent danger or great bodily harm. A rational juror could also find that Boyd's use of force was beyond what was necessary. The physical evidence showed that Boyd stabbed Hlousek 19 times and twisted the knife into Hlousek's head with such force that the blade broke off and lodged into Hlousek's skull. Thus, viewing the evidence in the light most favorable to the State, there was sufficient evidence that Boyd did not act in self-defense.

## II. VICTIM VULNERABILITY

### A. Sufficiency of the Evidence

When an appellant challenges the sufficiency of an aggravating factor under RCW 10.95.020, we review the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the presence of the aggravating factor beyond a reasonable doubt. *State v. Longworth*, 52 Wn. App. 453, 465-66, 761 P.2d 67 (1988). The aggravating factor of particular vulnerability requires "(1) that the defendant knew or should have known (2) of the victim's particular vulnerability and (3) that vulnerability must have been a substantial factor in the commission of the crime." *State v. Suleiman*, 158 Wn.2d 280, 291-92, 143 P.3d 795 (2006) (emphasis omitted). For a victim's vulnerability to be a substantial factor in the commission of a crime, which is necessary to justify an exceptional sentence, "the victim's disability must have rendered the victim 'more vulnerable to the particular offense than a nondisabled victim would have been.'" *State v. Mitchell*, 149 Wn. App. 716, 724, 205 P.3d 920 (2009), *aff'd*, 169 Wn.2d 437, 237 P.3d 282 (2010) (quoting *State v. Jackmon,* 55 Wn. App. 562, 567, 778 P.2d 1079 (1989)).

Boyd argues there was insufficient evidence for the jury to find the aggravating factor of the victim's particular vulnerability because there was no evidence that Hlousek's vulnerability played a substantial role in his demise. Boyd reasons that although Hlousek had a back injury and

was in pain, there was "no testimony or evidence that he was weak or unable to fight." Appellant's Opening Br. at 32. We disagree.

There was sufficient evidence for the jury to find the aggravating factor of Hlousek's particular vulnerability. At trial, the jury heard testimony from Mary and James that Hlousek suffered a "debilitating" back injury roughly eight months before his death. 1 VRP at 170. Jurors heard testimony that because of his injury, Hlousek was in "extraordinary pain" and had difficulty standing, walking, and sitting. 1 VRP at 128. The jury also heard testimony that these difficulties led Hlousek to rely on a cane or a walker to move around.

Moreover, witness testimony and video evidence demonstrated that Boyd threw Hlousek onto his back and straddled him, "domin[ating] over" Hlousek throughout the attack. 1 VRP at 208. Notably, Hlousek never punched, kicked, or stabbed Boyd, even when Boyd stood to pause between bouts of stabbing. A reasonable juror could find that the evidence indicates Hlousek was unable to defend himself, and though Hlousek's vulnerability was not the cause of the crime, there is sufficient evidence for a reasonable juror to infer that Hlouselk's vulnerability made him substantially more vulnerable to the crime than a nonvulnerable victim, who likely would have been physically capable of trying to resist the attack.

Viewed in the light most favorable to the State, there was sufficient evidence for a rational juror to find that Hlousek was particularly vulnerable.

B.      Special Verdict Form

Boyd asserts that the trial court erred in failing to require the jury to specifically find that Hlousek's vulnerability was a substantial factor in the commission of the crime as part of the special verdict form. Specifically, Boyd argues that the jury instruction provided both the

15

"'particular vulnerability'" and the "substantial factor" prong, but the special verdict form did not, and this was reversible error. CP at 235, 239. We disagree.

The appellate court may refuse to review any claim of error that was not raised in the trial court. RAP 2.5(a). An exception exists for errors that are both manifest and of constitutional magnitude. *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009). To meet this exception, an appellant must show that there was a constitutional error and that the alleged constitutional error affected the appellant's rights at trial. *Id*. at 99 (holding that a constitutional error is manifest if the appellant can show actual prejudice, i.e., that "'the asserted error had practical and identifiable consequences in the trial of the case'" (internal quotation marks omitted) (quoting *State v. Kirkman*, 159 Wn.2d 918, 935, 155 P.3d 125 (2007)).

Decisions regarding special verdict forms are reviewed under the same standard applied to decisions regarding jury instructions. *State v. Fehr*, 185 Wn. App. 505, 514, 341 P.3d 363 (2015). Error regarding a special verdict requires automatic reversal only when the trial court fails to instruct the jury on all essential elements of the special verdict. *See State v. Mills*, 154 Wn.2d 1, 9, 109 P.3d 415 (2005). When analyzing a challenged special verdict form, we consider the context of the related instructions as a whole and read the challenged portions in context. *Fehr*, 185 Wn. App. at 514.

Failure to instruct a jury on every element of a charged crime is an error of constitutional magnitude. *State v. Aumick*, 126 Wn.2d 422, 429, 894 P.2d 1325 (1995); *State v. Scott*, 110 Wn.2d 682, 689, 757 P.2d 492 (1988). But if the combination of the jury instructions and the special verdict form properly informed the jury of the charged crime's elements, any error in further defining terms used in the elements is not of constitutional magnitude. *Fehr*, 185 Wn. App. at 514; *see also State v. Stearns,* 119 Wn.2d 247, 250, 830 P.2d 355 (1992).

Because Boyd raises this issue for the first time on appeal, we may refuse to review the claim unless it involves a manifest error of constitutional magnitude. Here, the jury received instructions consistent with WPIC 300.11. *See* 11A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 300.11, at 889 (5th ed. 2021) (WPIC). The relevant instruction made it clear that to answer "yes" to the special verdict form, the jury had to be satisfied beyond a reasonable doubt of both the "'particularly vulnerable'" prong and the victim's vulnerability as a "substantial factor in the commission of the crime" prong. CP at 235. We must evaluate the special verdict form in context, also considering what the jury was told in the relevant jury instructions. The jury instructions about the special verdict on victim vulnerability included all required elements. Boyd has not established that the special verdict form must independently reference every element mentioned in the instructions. Thus, Boyd's claim fails.

### III. SOLICITATION

Lastly, Boyd argues that the State failed to show beyond a reasonable doubt that Boyd committed the crime of solicitation of assault in the first degree. Specifically, Boyd asserts that the State did not provide sufficient evidence to show that Boyd intended to promote or facilitate a crime. We disagree.

A person is guilty of criminal solicitation when, "with intent to promote or facilitate the commission of a crime," they offer something of value to someone "to engage in specific conduct which would constitute such crime." RCW 9A.28.030(1). To establish the crime of solicitation, the State must prove the defendant's "'intent to promote or facilitate a crime.'" *State v. Varnell*, 162 Wn.2d 165, 169, 170 P.3d 24 (2007) (citing RCW 9A.28.030(1). Whether the crime is actually committed is irrelevant under the statute because solicitation exists "independently of any crimes actually committed pursuant to the agreement of solicitation." *Id.* at 170. "Solicitation involves no

more than asking someone to commit a crime in exchange for something of value." *State v. Jensen*, 164 Wn.2d 943, 952, 195 P.3d 512 (2008). On issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence, we defer to the trier of fact. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

Here, Boyd said, "'I'll pay you $50,000 to stab that bitch Mary in the face'" to a law enforcement officer. 1 VRP at 353. Initially, Boyd testified that he did not recall making the offer. Now, Boyd concedes that he made the offer, but asserts there is insufficient evidence that he intended to do anything other than to "mouth[] off." Appellant's Opening Br. at 36.

The State presented evidence that Boyd had recently acquired over $1,000,000, that Boyd offered money to an officer to stab Mary, and that Boyd had just stabbed Mary's husband to death—possibly motived by suspected embezzlement of Boyd's funds to which Mary had access. Though Boyd testified that he does not recall making the statement, and now argues that he did not mean anything by it, we defer to the trier of fact on issues of conflicting testimony. The jury heard both Hartley and Boyd testify and was free to decide whether Boyd's version of events was credible. Viewing the evidence in the light most favorable to the State, there was sufficient evidence for a rational trier of fact to conclude that Boyd solicited assault in the first degree with intent to promote the assault, supporting the solicitation conviction.

CONCLUSION

We affirm.

No. 57958-8-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, J.

We concur:

Veljacic, A.C.J.

Price, J.