

# THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 67142-1-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| RANDALL EDWARD CONNOR, | ) | |
| Appellant. | ) | FILED: March 18, 2013 |
| | ) | |

APPELWICK, J. — Connor appeals his conviction for first degree premeditated murder based on the stabbing death of Lorentson. He challenges the sufficiency of the evidence to prove premeditation. The evidence of motive, use of a weapon, a prolonged assault, and the infliction of blunt force injuries in addition to more than 30 stab wounds was sufficient for the jury to find premeditation. None of the issues Connor raises pro se in his statement of additional grounds have merit. We affirm.

## FACTS

Merianne Lorentson made plans to meet her friend Stanford Muller on the evening of Wednesday March 7, 2007, at a skating rink in Kent where they often skated together. When Lorentson did not show up, Muller repeatedly tried to call her that night and the following day. He was unable to reach her. On Thursday night, March 8, Muller

drove to Lorentson's apartment and saw her car in the parking lot. On Friday morning, Muller called the apartment manager and asked him to check on Lorentson.

The apartment manager and two maintenance employees proceeded to Lorentson's apartment, found the door unlocked, and entered. They discovered Lorentson's dead body on the living room floor with "blood all over" and a pillow covering her face. The apartment manager called the police, while one of the maintenance workers looked around to ensure that Lorentson's five year old daughter was not present.

Police Officers from the Kent Police Department and Natasha Pranger, a member of the Washington State Patrol Crime Laboratory crime scene response team arrived to investigate. Lorentson had been stabbed over 30 times and suffered blunt force trauma to the face, head, and torso. Lorentson was found fully clothed in dark clothing. A second set of white bloodstained clothing was found in the bathroom. The white clothes were not marred by knife marks, suggesting that Lorentson had also been injured and bled while wearing the first set of clothing.

The police investigation eventually focused on Randall Connor, who was involved in a relationship with Lorentson at the time of her death. The State charged Connor with first degree murder.

The evidence presented over the course of the six week trial established that just before her death, Lorentson had become romantically involved with Reginald Smith. Smith and Lorentson had met a few years earlier when they were both students at Seattle Central Community College. They reconnected online through a mutual friend.

A couple of days before Lorentson was killed, Smith spent the night at her apartment. In the morning, Lorentson drove Smith to work.

On the evening of Wednesday March 7, Lorentson was at Smith's house from approximately 4:00 p.m. until 9:00 p.m. Lorentson and Smith had sexual intercourse. Lorentson spoke to Smith on the telephone after she left to go skating. Smith told Lorentson she left her jacket behind and Lorentson said she would come back to retrieve it after she finished skating. But, Lorentson did not return, and Smith did not hear from her again.

On Saturday March 10, several Kent police department officers attempted to locate Connor at his mother's house. Connor was not there, but police interviewed others who were home, including Connor's his sister and uncle.

According to Connor's sister, on the afternoon of March 7, Connor told her that Lorentson was breaking up with him. Later that night, when Connor arrived at his mother's house, he told his sister that if anyone asked, to say that he was there after 9:00 p.m. Connor's sister also reported that the following day, on March 8, Connor suggested he would be incarcerated again for awhile. Assuming he was talking about a parole violation, she disagreed, but Connor said he "did something else."

According to Connor's uncle, Laurence Rex, Connor came home to his mother's house on the night of March 7 wearing his brother's clothes and asked Rex to build a fire in the fireplace. Connor then proceeded to burn clothing he was carrying with him in

3

a bag. Connor then took a shower and laundered the clothes he was wearing.[1] Rex saw that he was carrying a knife. After the police visit on March 10, Rex called Connor to warn him that the police were looking for him.

Connor's sister-in-law picked him up from his mother's house on the evening of March 8. While they were driving, Connor told her that Lorentson had been cheating on him. He declared that he "wasn't messin' with her anymore" and that he "sometimes felt like stabbing her."

Police eventually located Connor and interviewed him on March 12. Connor described Lorentson as "his girl" but displayed no reaction when police told him she was dead. Connor reported that he last saw Lorentson in downtown Seattle on Wednesday March 7 at around 9:00 or 10:00 p.m. when they "hung out" for about a half hour. Connor also said that he had sexual intercourse with Lorentson on Tuesday or Wednesday at her apartment. He admitted that he used to have a knife, but said he lost it about three weeks prior. He said that Lorentson was planning to leave for a white water rafting trip in Oregon. No one else interviewed as a part of the investigation reported that Lorentson mentioned plans of a rafting trip.

Connor's DNA (deoxyribonucleic acid) was found on vaginal swabs taken from Lorentson's body and on the pants and underwear she was wearing when she was found. Semen deposits on the discarded white sweatpants found on Lorentson's bathroom floor contained Smith's DNA.

---

[1] Rex withheld this information when he was initially interviewed twice by law enforcement, but explained that he decided to come forward based on a new "outlook."

4

While awaiting trial in King County Jail, Connor admitted to fellow inmate Ericson-Gerard Gonzalez that he had stabbed his former girlfriend. Connor told Gonzalez he found out she had sexual contact with another man. Connor said he was enraged, had a big argument with his girlfriend about it, and stabbed her multiple times. Connor told Gonzalez that he was "kind of high on drugs that day."

The jury convicted Connor as charged.

## DISCUSSION

### I. Premeditation

Connor does not challenge the sufficiency of the evidence establishing that he stabbed Lorentson to death. Rather, he claims there was no evidence of premeditation. Evidence is sufficient to support a conviction if, viewed in the light most favorable to the prosecution, it permits any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." Id. Circumstantial and direct evidence are equally reliable. State v. Delmarter, 94 Wn .2d 634, 638, 618 P.2d 99 (1980). We defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. State v. Walton, 64 Wn. App. 410, 415-16, 824 P.2d 533 (1992).

A person is guilty of first degree murder when "[w]ith a premeditated intent to cause the death of another person, he or she causes the death of such person." RCW 9A.32.030(1)(a). Premeditation involves "more than a moment in point of time." RCW

5

9A.32.020(1). It is the "deliberate formation of and reflection upon the intent to take a human life and involves the mental process of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short." State v. Hoffman, 116 Wn.2d 51, 82-83, 804 P.2d 577 (1991). Premeditation may be shown by circumstantial evidence if the jury's inferences are reasonable and substantial evidence supports the jury's verdict. State v. Pirtle, 127 Wn.2d 628, 643, 904 P.2d 245 (1995).

Motive, procurement of a weapon, stealth, and method of killing are "particularly relevant" factors in establishing premeditation. Id. But, while these factors are relevant, they are not elements of the crime, and sufficient proof of premeditation does not require all four elements. See State v. Ortiz, 119 Wn.2d 294, 297, 312-13, 831 P.2d 1060 (1992) (sufficient evidence of premeditation without discussion of motive or stealth); see also State v. Sherrill, 145 Wn. App. 473, 485, 186 P.3d 1157 (2008) (sufficient evidence of premeditation despite lack of evidence of motive, procurement of a weapon, or stealth). Here, Connor concedes there was evidence of motive. But, he argues there was no evidence that he deliberately procured a weapon or engaged in stealth, and he argues that the manner of the killing did not demonstrate premeditation.

The evidence supports the inference that Connor brought the murder weapon to Lorentson's apartment. But, according to Connor, the evidence conclusively established that he "routinely" carried a knife. Therefore, the fact that he used that weapon against Lorentson is not indicative of any prior planning or formation of intent. But, Connor himself merely told police that he had a "Smith and Wesson buck type knife" but lost it several weeks before the murder. He did not say that he had other

6

knives or that he always carried a knife. Therefore, the jury could draw the inference that Connor specifically carried a knife on the night of the murder because he intended to use it.

But, the strongest indication of premeditation was the manner of the attack on Lorentson. Despite Connor's claim to the contrary, the evidence suggested a prolonged assault. There was evidence that before he began stabbing her, Connor struck Lorentson in the face and torso and caused her to bleed. He engaged in sexual intercourse with her (consensual or not). Lorentson attempted to clean herself up and changed clothes. After she changed into different clothes, Connor stabbed her repeatedly. Most of the stabbing wounds were clustered around Lorentson's neck. At least three of these wounds were potentially lethal. Lorentson also sustained serious stab wounds in her chest and back. The evidence suggested that most of the stabbing took place around a chair next to where Lorentson's body was found and that Lorentson was in various positions—sitting on the chair, kneeling on it, and leaning over it—while she was stabbed.

In numerous cases, our courts have determined that both the infliction of multiple injuries and more than one manner of assault is strong evidence of premeditation. See Pirtle, 127 Wn.2d at 645; State v. Cross, 156 Wn.2d 580, 627-28, 132 P.3d 80 (2006); State v. Ra, 144 Wn. App. 688, 703, 175 P.3d 609 (2008); State v. Gibson, 47 Wn. App. 309, 312, 734 P.2d 32 (1987). For example, in Ortiz, the Supreme Court concluded there was sufficient evidence of premeditation where the assailant inflicted multiple wounds with a knife he had taken from the kitchen and used in the bedroom, the victim

was struck in the face with something other than the knife, and defensive wounds indicated a prolonged struggle. 119 Wn.2d at 312-13. In State v. Ollens, 107 Wn.2d 848, 853, 733 P.2d 984 (1987), there was sufficient evidence of premeditation where the defendant stabbed victim multiple times and then slashed the victim's throat, the defendant procured a knife, struck victim from behind, and had motive to kill. Finally, in State v. Woldegiorgis, 53 Wn. App. 92, 93, 765 P.2d 920 (1988), the victim was stabbed 14 times, four of the wounds were defensive; the victim was found one and one-half feet from his bed, tangled in the sheets. Also, there was evidence of long-standing animosity between the victim and the defendant. Id. at 93-94. The jury was entitled to find premeditation. Id. at 94.

Here, the victim sustained over 30 stabbing injuries and was assaulted in more than one way over a period of time. Pointing to the absence of defensive wounds, Connor suggests that Lorentson must have died quickly. This is sheer speculation, unsupported by the record. It does not negate the evidence of multiple injuries and means of assault. The evidence was sufficient for the jury to find that Connor reflected and deliberated on the intent to take Lorentson's life.

II. Statement of Additional Grounds

Connor claims that the trial court erred in denying his pretrial motion to disqualify the King County Prosecutor's Office. In this motion, Connor argued that his prosecution by the King County Prosecutor's Office created an appearance of unfairness, because Lorentson's father was formerly employed by the office and because of quoted statements of a former King County prosecutor describing Lorentson's death as a

tragedy. But, the appearance of fairness doctrine does not apply to prosecutors acting in their executive branch authority to prosecute criminal cases. State v. Finch, 137 Wn.2d 792, 808-10, 975 P.2d 967 (1999). And, given the lack of evidence that the prosecutor's office treated the case differently, because of its association with the victim's father, Connor fails to demonstrate any error.

Connor argues the trial court improperly denied his motion for a Frye[2] hearing regarding the admissibility of evidence regarding cellular tower technology to identify the physical location of Lorentson and others based on cell phone calls. It appears that after hearing from experts from both sides, the trial court stated that it did not anticipate the need for a Frye hearing, because the technology at issue was not novel, nor essentially challenged by the defense's expert. The defense indicated that it would gather additional factual information, but it does not appear that it raised the issue of a Frye hearing again or sought a final ruling. Witnesses testified about locations and coverage areas of cell phone towers without objection. Because the trial court's statements were clearly preliminary and Connor failed to object to the evidence or seek a final ruling, he waived the claim of error. See State v. Asaeli, 150 Wn. App. 543, 587, 208 P.3d 1136 (2009). In any event, he presents no argument that the trial court erred in its initial assessment of the evidence.

Next, Connor contends the trial court erred in denying his discovery request for Lorentson's medical records to show whether or not she was pregnant at the time of her

---

[2] Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).

death. But, he fails to cite to the record, and it is not clear that the trial court ruled on such a request. See RAP 10.10(c) (appellate court not obligated to search record in support of claims made in statement of additional grounds for review); State v. Meneses, 149 Wn. App. 707, 716, 205 P.3d 916 (2009), affirmed, 169 Wn.2d 586, 238 P.3d 495 (2010). Moreover, Connor fails to demonstrate the relevancy of this evidence. He suggests that the evidence would have shed light on the credibility of Lorentson's statements before her death that she was afraid of him. However, it does not appear that there was any evidence about what, if anything, Lorentson told Connor about being pregnant. And, Lorentson's credibility based on prior statements of expressing fear of Connor was not an issue because trial court excluded that evidence.

Finally, Connor argues that it was error for the trial court to allow the State's DNA expert, a forensic scientist, to testify about her opinion that Lorentson likely had sexual intercourse first with Smith and then with Connor. He claims, without further explanation, that this opinion was "beyond her expertise." The expert's opinion was based on her finding of Smith's DNA on the white sweatpants and Connor's DNA on vaginal swabs and on the clothing Lorentson was wearing when she was killed. She testified that, because vaginal drainage occurs quickly, it would be highly unlikely for Smith to have had intercourse after Connor but for testing to reveal only Connor's DNA in the vaginal vault. Connor makes no showing that this testimony was not helpful to the jury and informed by the expert's specialized knowledge and training. See ER 702. The trial court did not abuse its discretion in admitting the evidence. See State v. Nelson, 152 Wn. App. 755, 765, 219 P.3d 100 (2009).

10

To the extent that Connor raises additional issues in his statement of additional grounds, the alleged errors are unreviewable under RAP 10.10(c) because he fails to adequately "inform the court of the nature and occurrence of alleged errors." We affirm Connor's conviction and sentence.

WE CONCUR: