

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 38782-8-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RAYLIN DWAYNE JAMES, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

STAAB, J. — Raylin James appeals his conviction for first degree murder. He argues there was insufficient evidence of premeditation to convict him as a principal and insufficient evidence to convict him as an accomplice. We find the evidence sufficient and affirm his conviction.

BACKGROUND

The State charged Raylin James with first degree murder of Leroy Scott as a principal or alternatively as an accomplice. Because James challenges the sufficiency of the evidence, we set forth the facts in a light most favorable to the State. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

James, Gerald, and Leroy Scott became friends while they were in the military and were stationed together at Joint Base Lewis McChord (JBLM). The three were close and

called each other brothers. However, according to Scott's ex-girlfriend, Jazmyn Kelly, James and Gerald "cared more about each other than they did [Scott]" and "didn't have [Scott's] best interests at heart." Rep. of Proc. (RP) at 410. James and Gerald's behavior toward Scott worsened over time.

At some point, Scott moved to a new room in the barracks at JBLM. Before switching rooms, Scott and Kelly moved all of Scott's belongings and then thoroughly deep cleaned Scott's old room. After Scott moved, marijuana was found in his old room, and he was discharged as a result. Kelly, Scott, James, and Gerald were the only individuals who knew the key code for Scott's old room.

James and Gerald believed that when Scott had been questioned about the marijuana, Scott said that the marijuana belonged to James and Gerald.

While Scott was being discharged, James and Gerald borrowed his car. Scott asked them to return the key afterwards, but James and Gerald denied having it. When they would not return the key, Scott informed a military superior of the situation. The key was ultimately returned, but Scott was now "two times a snitch" in the eyes of James and Gerald. RP at 416. When Scott was finally able to get into his car, he found that it had been filled with shredded paper.

Following Scott's discharge, he and Kelly moved to eastern Washington. About four months after his discharge, Scott made plans to travel to Ellensburg and celebrate his birthday with his friend Hadassah Fisch. Although Scott's relationship with James and

2

Gerald remained strained, the two were invited to Scott's birthday celebration. The group partied into the early morning hours.

At some point during the party, Scott appeared to have "lost his energy," as if something was off. RP at 461. Around 1:00 am, James, Gerald, and Scott left the party without saying anything. About an hour later, James and Gerald returned covered in blood and dirt without Scott. Fisch asked where Scott was, and James responded that he was in a ditch.

Approximately two days later, James called Scott's mother and told her "some white guys" had beat Scott to death and tried to rape him.

Scott's body was discovered by a stranger and reported to the police. The body was found in a remote area "out in the middle of nowhere" at the edge of a creek next to the road. RP at 186. Scott's pants were pulled down to his ankles. Nearby, police found three rocks and a pointed stick, all with Scott's blood on them.

Scott's body had extensive injuries. The coroner testified that Scott's injuries appeared to be the result of several different instruments or surfaces. There were multiple indications of trauma including lacerations, bruising, redness, and chunks of skin missing from his neck, ear, and face. This included one wound inflicted with some sort of instrument, possibly a knife or a sharp rock. Scott's eyes were swollen shut, and there were deep injuries to the back of his head. Scott also had dozens of wounds on his face. His teeth were bloody and appeared to have been pushed up into his jaw that had been

detached and was maneuverable. In addition, Scott sustained defensive wounds, including bruising on his forearms and a torn thumbnail.

Scott also sustained internal injuries. His shoulder appeared to be either separated or broken, and his skull was fractured in multiple places.

A lighter was found near Scott's body. There was evidence of an attempt to light his body on fire as a substance containing petroleum distillate, contained in lighter fluid, was found on his clothing, and his skin appeared to have been exposed to a petroleum product. Scott's hair also appeared to have been exposed to a flame.

The State presented evidence regarding the cell phone data of Scott, James, and Gerald in the time surrounding Scott's death. Each of the individuals' phones pinged between 1:27 a.m. and 1:53 a.m in the area where Scott's body was found. Then a ping of James' phone from 1:58 a.m. showed that he had left the area. However, Scott's phone did not leave.

Following the discovery of Scott's body, police spoke with Fisch. Fisch testified that she initially was not honest with police about events that had transpired around Scott's death because she had been "scared for [her] life" and had seen what had happened to Scott because "he had snitched." RP at 448. She said that when James finally left the party she texted him to "get back safe" because she "was pretty scared" and wanted James to know that things were "cool" between them. RP at 463. Fisch also said that James and Gerald were closer with each other than they were with Scott.

4

Erika Key, a friend of Scott, also testified. Key said that, although Scott was excited to see his friends at his birthday party, he was worried about "two individuals." RP at 945. Key stated that Scott expressed concern there would be drama at the party because of "the whole thing with the military" and that Scott had "bad blood with some people." RP at 945. She also said that Scott's concerns were related to the reason he had left the military.

During the investigation, police recovered a black bloody jacket from the trunk of James' vehicle similar to the one James had been seen wearing just prior to leaving the party with Scott. The jacket tested positive for Scott's, and possibly James' DNA.[1]

The trial court instructed the jury on the definition and elements of first degree murder. "A person commits the crime of murder in the first degree when, with a premeditated intent to cause the death of another person, he or she causes the death of such person or of a third person." Clerk's Papers at 296. The trial court also instructed the jury that it could find James guilty as an accomplice.

The jury returned a general verdict of guilt against James. The jury did not make a specific finding as to whether James was guilty as a principal or as an accomplice.

James appeals, arguing that there was insufficient evidence to support his conviction.

---

[1] Deoxyribonucleic acid.

5

No. 38782-8-III
*State v. James*


ANALYSIS

1.    STANDARD OF REVIEW

Sufficiency of the evidence is reviewed de novo.  *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016).  Washington follows the standard of review for a challenge to the sufficiency of the evidence as set out in *Jackson v. Virginia*.[2]  *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980).  When reviewing a challenge to the sufficiency of the evidence to prove the elements of an offense, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319.  The purpose of this standard of review is to ensure that the fact-finder rationally applied the constitutional standard required by the due process clause of the Fourteenth Amendment to the United States Constitution, which allows for conviction of a criminal offense only upon proof beyond a reasonable doubt.  *Id*. at 317-18.

In claiming insufficient evidence, the defendant necessarily admits the truth of the State's evidence and all reasonable inferences drawn from it.  *Salinas*, 119 Wn.2d at 201. These inferences "must be drawn in favor of the State and interpreted most strongly against the defendant."  *Id*.  Further, we must defer to the trier of fact to resolve conflicting testimony and evaluate the persuasiveness of the evidence.  *State v.*

6

*Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990) (credibility determinations cannot be reviewed on appeal), *abrogated on other grounds by State v. Crossguns*, 199 Wn.2d 282, 505 P.3d 529 (2022). Direct and circumstantial evidence are weighed equally. *State v. Scanlan*, 193 Wn.2d 753, 770, 445 P.3d 960 (2019). "[I]nferences based on circumstantial evidence must be reasonable and cannot be based on speculation." *State v. Vasquez*, 178 Wn.2d 1, 16, 309 P.3d 318 (2013).

2.     FIRST DEGREE MURDER

James argues that there was insufficient evidence of premeditation to convict him of first degree murder as a principal. We disagree.

A person commits the crime of first degree murder when "[w]ith a premeditated intent to cause the death of another person, he or she causes the death of such person or of a third person." RCW 9A.32.030(1)(a). The State has the burden of proving premeditated intent to kill that "involve[d] more than a moment in point of time." RCW 9A.32.020(1). However, the simple fact that a person had an opportunity to deliberate is insufficient to show premeditation. *State v. Pirtle*, 127 Wn.2d 628, 644, 904 P.2d 245 (1995). "Rather, premeditation is 'the deliberate formation of and reflection upon the intent to take a human life' and involves 'the mental process of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short.'" *Id.* at 644 (quoting *State v. Gentry*, 125 Wn.2d 570, 597-98, 888 P.2d 1105 (1995)).

---

[2] 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979).

The State may use circumstantial evidence to prove premeditation if the inferences by the jury from the evidence are reasonable and the evidence is substantial. *Id.* at 643. "Four characteristics of the crime are particularly relevant to establish premeditation: motive, procurement of a weapon, stealth, and the method of killing." *Id.* at 644. The factors of procurement of a weapon and stealth can also be combined to show planning. *Id.*

James maintains that the State failed to present evidence of a motive, procurement of a weapon, stealth, or planning. But examination of the record reveals evidence supporting each of the four factors relevant to premeditation.

First, James had a motive to kill Scott: revenge for Scott "snitching" on him and Gerald. Kelly and Key both testified regarding the "bad blood" between the three ever since Scott supposedly snitched on James and Gerald regarding the marijuana found in his barracks and failing to return his key.[3] RP at 422, 945-46. There was evidence that James and Gerald had previously retaliated for Scott's "snitching" by filling Scott's car with shredded paper. Additionally, Fisch testified that she had not initially been honest with police regarding the incidents surrounding Scott's death because she had seen what

---

[3] James briefly mentions that Kelly's testimony regarding motive was hearsay. Br. of Appellant at 16. However, no hearsay objection was raised below, and James offers no legal analysis of Kelly's testimony under the hearsay rule on appeal. Accordingly, we decline to address this argument. *See* RAP 2.5(a); RAP 10.3(a); *Regan v. McLachlan*, 163 Wn. App. 171, 178, 257 P.3d 1122 (2011) ("We will not address issues raised without proper citation to legal authority.").

had happened to Scott because "he had snitched." RP at 448. All of this testimony demonstrated that James had a motive to kill Scott.

Second, there was testimony presented that Scott sustained stab wounds inflicted by a sharp instrument. This could have been the bloody sharp stick found at the scene, a knife brought by James or Gerald, or some other instrument. Either way, the use of a weapon in Scott's killing was indicative of premeditation because such a weapon would have had to have been taken up prior to the attack.

Third, in regard to the stealth factor, the testimony regarding the injuries to Scott's body indicated that he may have been thrown from behind and that he had received severe blows to the back of his head. *See State v. Ollens*, 107 Wn.2d 848, 853, 733 P.2d 984 (1987) (fact that defendant struck victim from behind tended to show premeditation). Moreover, the testimony presented at trial showed that James and Gerald drove with Scott to an isolated location where they then beat him to death. There was also evidence that they brought lighter fluid with them and attempted to burn Scott's body after they beat him. All of this evidence supported stealth because it showed an attempt to conceal the murder.

Fourth, the fact that there was evidence that Scott was struck multiple times from different directions in addition to being cut with a weapon was indicative of premeditation. Not only did the multiple wounds and injuries demonstrate that the beating of Scott was committed by several distinct acts, the fact that one wound was

9

caused by a weapon and the others appeared not to be, tended to show premeditation. *See id.* (fact that defendant not only stabbed the victim multiple times but also subsequently slit his throat indicated premeditated intent to kill). Additionally, Scott's defensive wounds showed that there was a physical struggle, further evidence of premeditation. *See State v. Allen*, 159 Wn.2d 1, 8, 147 P.3d 581 (2006) ("a physical struggle over 'an appreciable period of time' prior to strangulation is sufficient evidence of premeditation") (quoting *State v. Harris*, 62 Wn.2d 858, 868, 385 P.2d 18 (1963)).

In sum, the combined evidence relating to motive, use of a weapon, stealth, and Scott's manner of death was sufficient evidence of premeditation to convict James of first degree murder as a principal.

3.      ACCOMPLICE LIABILITY

James also argues that there was insufficient evidence to convict him as an accomplice because the evidence did not indicate that he had assisted, encouraged, or commanded Gerald in any manner before, during, or after the killing. Br. of Appellant at 21. We determine that James' argument fails.

"[A]ccomplice liability represents a legislative decision that one who participates in a crime is guilty as a principal, regardless of the degree of the participation." *State v. Hoffman*, 116 Wn.2d 51, 104, 804 P.2d 577 (1991)). "A person is an accomplice if, with knowledge that it will promote or facilitate the commission of a crime, he solicits, commands, encourages, or requests another person to commit the crime or aids or agrees

to aid another in planning or committing the crime." *State v. Holcomb*, 180 Wn. App. 583, 587, 321 P.3d 1288 (2014).

Accomplice liability is neither an element of a crime nor an alternative means of committing a crime. *State v. Teal*, 152 Wn.2d 333, 338, 96 P.3d 974 (2004). Thus, where a defendant is charged as both a principal and an accomplice, the jury "need not reach unanimity on whether a defendant acted as a principal or an accomplice in the crime for which the defendant was charged, so long as 'it was convinced that the alleged crimes were committed and that the [defendant] participated in each of them.'" *Id.* at 339 (quoting *State v. Carothers*, 84 Wn.2d 256, 261, 525 P.2d 731 (1974)).

As a result, our Supreme Court has held that where there is evidence to support either liability as a principal or liability as an accomplice, the State may charge a defendant as both a principal and an accomplice but need only present substantial evidence that the defendant acted as either a principal or an accomplice. *State v. McDonald*, 138 Wn.2d 680, 686-87, 981 P.2d 443 (1999) ("We also agree that, because there is substantial evidence of accomplice liability, under the trial court's instruction we need not examine whether the evidence supports principal liability as well.").

The State points to no evidence here supporting its decision to charge James as an accomplice as well as a principal. However, under *McDonald*, as the evidence was sufficient to charge James as a principal, it was sufficient to charge him as an accomplice as well. Accordingly, we disagree with James' argument.

11

No. 38782-8-III
*State v. James*

James points to this court's prior decisions in *State v. Jameison*, 4 Wn. App. 2d 184, 421 P.3d 463 (2018) and *State v. Luna*, 71 Wn. App. 755, 862 P.2d 620 (1993) to support his argument. In both cases, this court determined that there was insufficient evidence to support the State's charge of first degree murder based on the theory of accomplice liability. *Jameison*, 4 Wn. App. 2d at 203-09; *Luna*, 71 Wn. App. at 759-60. However, both decisions differ from this case because the defendants were charged solely as accomplices and not as principals. *Jameison*, 4 Wn. App. 2d at 192; *Luna*, 71 Wn. App. at 758. Here, on the other hand, James was charged as a principal and an accomplice and because sufficient evidence supported a finding that he acted as a principal, the State was not required to present evidence to support accomplice liability.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Staab, J.

WE CONCUR:

_____
Lawrence-Berrey, A.C.J.

_____
Siddoway, J.

12